NEW YORK GRAPE SUGAR CO. v. BUFFALO GRAPE SUGAR CO. and others.

SAME v. AMERICAN GRAPE SUGAR CO. and others.

(*Circuit Court, N. D. New York.* November 20, 1883.)

1. PATENTS FOR INVENTIONS—ABANDONMENT BY PATENTEE—INFRINGEMENT, ETC.
     Questions in regard to the abandonment of a patent and in regard to equities in favor of an infringer which will prevent an injunction, considered.

2. SAME.
     Evidence of the abandonment of a part of a claim of a patent, taken in connection with the fact that the most important part of the claim, both in fact and as considered by the patentee, has not been abandoned, *held* not sufficient evidence to justify a finding of abandonment.

3. SAME—CLAIMS FOR PROFITS OR DAMAGES ARISING FROM PAST INFRINGEMENT IN THE HANDS OF AN ASSIGNEE OF THE PATENT.
     The claims for profits or damages arising from infringement prior to a purchase of the patent are choses in action, and the assignee takes the title subject to all the equities existing against the assignors. Such claims do not pass by a mere assignment of the patent. The assignee of a patent seeking to recover for infringements before the assignment must allege an assignment of the claims for past infringement.

*Dickerson & Dickerson* and *Roscoe Conkling,* for plaintiff.

*John R. Bennett, George Harding,* and *Sherman S. Rogers,* for defendants.

SHIPMAN, J. These are two bills in equity, brought by the same plaintiff against different corporations and their respective officers, each bill alleging the infringement of the same five patents by the respective defendants. The first and fundamental patent, No. 65,664, was issued to Joshua J. Gilbert, June 11, 1867, for an improved method and machinery for manufacturing starch. The second patent is reissued patent No. 9,732, issued to Thomas A. and William T. Jebb, assignees of John A. Owens, May 31, 1881; the original having been issued to Owens, January 14, 1868. The third patent is to Colgate Gilbert, No. 81,888, and dated September 8, 1868. The fourth patent is to John A. Owens, No. 78,320, dated May 26, 1868, and the fifth is to Colgate Gilbert, No. 137,911, dated April 15, 1873. The last four patents are for minor improvements in machinery for the manufacture of starch.

The important matter in the manufacture of starch from corn, rice, or other grain is the thorough separation of the starch from the gluten. Formerly, this was accomplished by the process of fermentation. Latterly, it has been effected by the application of alkaline solutions to the grain either before or after it was ground, or both before and after, and by subsequent elutriations or purifications by repeated washing and decanting. As a general rule, the starch was permitted to settle in the vats where the washing process was carried on. Sometimes the liquid mass was run from the sieve, directly after

being ground, over a slightly inclined table, upon which the starch was deposited while the gluten flowed away, and was then washed, and was again caused to pass over a table, as described in the Polaillon & Millard English patent.  In this process neither fermentation nor acids were used.  The English patent of John Polson described three processes: *First,* the starchy fluid, after the grain had been ground and passed through a sieve, was made to flow over a plane surface upon which slips of wood or weirs had been placed so as to equalize the flow, and was then washed; *secondly,* the starchy matter, after having been treated by the alkaline process with the various washings which have been mentioned, and which are given in that process, was made to flow over the depositing plane, leaving pure starch deposited over the entire surface of the plane; *thirdly,* "the starchy matter may be submitted to this second process in the state in which it is left by the hereinbefore first mentioned depositing process; that is to say, the starchy matter, as left deposited upon the depositing plane, may be treated by the usual alkali process, and then again passed over the depositing plane, for the production of starch in a state of superior purity."  No process before that of Gilbert produced good laundry starch in less than from eight to ten days.

In 1860 Joseph J. Gilbert commenced the manufacture of starch at Little Falls, New York.  He perfected the patented process in 1866, and applied for a patent on March 11, 1867.  Colgate Gilbert, his brother, also commenced the same business at Black Rock, New York, in the fall of 1864.  He was a follower and licensee of Joseph J., and began to use the patented process after it had been perfected by the latter.  All attempt either to show a use of the perfected process by Joseph J. or by Colgate Gilbert more than two years before the date of the application, or that Colgate Gilbert was the first inventor, failed.

The patented process is as follows:

The ground grain, to which no alkali has been applied, is discharged into a vibrating separator, or sieve, into which water flows.  The finer portions of the grain are washed through the meshes of the sieve, and are conveyed by means of a spout into a vat, called in the patent, E.  "This vat is large enough to contain the product of one day's work, which product is allowed to settle overnight.  The next morning the water is drawn off by removing a plug in the sides of the vat.  The plug is then replaced, and a solution of caustic alkali is introduced, the proportion being 60 pounds of alkali to the stock from 60 bushels of grain to 1,000 gallons of water.  The agitator in the vat is now started and kept in motion about six hours.  In the mean time, the vat, F, is receiving the products of the separator to be operated upon the following day.  The contents of the vat, E, are now pumped up into the highest part of the depositor, H.  The depositor is composed of a series of inclined parallel spouts or troughs, which descend longitudinally, and which are connected with each other in such a manner that liquid poured into the upper spout is discharged into the lower one.  The gluten of the grain, being dissolved by the alkali in the vat, flows off, while the starch is deposited nearly pure.  The starch is now taken from the depositor and thrown onto the wooden grate, *h,* in the small vat, G, where, in combination with a

stream of water which is let on, it is washed through the grate to be acted upon by the agitator in the vat. After being agitated a suitable length of time, it is allowed to rest for a while, when a valve is opened, and it is allowed to flow into the settling vats below, where it is drained as usual."

By this process nearly pure starch is deposited in the trough in a smooth, white, hard mass. It must further be purified by additional washing in the vat, G, and thereafter be permitted to settle, as must be done in all the processes, but this washing is distinct from the washings which are especially for the purpose of separating the starch from the gluten. This separating process is substantially effected by Gilbert by means of the agitating vat and the inclined table. In the prior processes it was ordinarily effected by the washing and siphoning from vat to vat. The Gilbert process accomplishes in 24 hours, or less, that which by any previous process had taken from 8 to 10 days. His process consists in the manner of treatment of the ground grain, and in the order and sequence in which the various steps are taken, and more particularly consists in the treatment of the liquid mass of starch and gluten, from which the water had been drawn off, with caustic alkali and the agitation of the mass for about six hours, and the immediate transfer to the depositor without washing, and the deposit of the nearly pure starch upon the depositing plane. In the first Polson process the depositing plane did not accomplish the separation of starch and gluten so that the deposited starch was nearly pure for laundry purposes, and in no prior process did the depositing plane substantially accomplish the separation immediately after the agitation of the combined starch and gluten in an agitating vat without the previous repeated washings which are a part of what is called in the Polson patent the alkali process. When Polson speaks of the well-known alkali process, he means the alkaline treatment with the various washings which are given to that process, and which occupy a long time. This process is described in the English patent of Orlando Jones.

The Messrs. Duryea agitated and then transferred the liquid in troughs to vats, where the separation was effected by repeated washings. There was some deposit of starch upon the bottom of the troughs as the liquid flowed into the vats, but this deposit was merely incidental to the transfer. The separation was effected, and was intentionally effected, by a protracted and careful treatment with water; and it was not until 1877 that the Duryeas introduced into their works the Gilbert process, the novelty and the merit of which consisted in the fact that it avoided lengthy and repeated washings and siphonings, and yet obtained laundry starch with a much less expenditure of time and money than had ever been known. The claims of the patent are as follows:

"The separator, D, constructed and arranged substantially as herein shown and described for the purposes set forth. I claim the depositor, H, constructed substantially as herein described for the purposes set forth. In combination

with the separator, I claim the vats, arranged substantially as described, and the method herein described of manufacturing starch."

I understand that the third claim is a double claim for the combination of machinery, and also for the process. It can hardly be supposed that the patentee meant to claim a combination of machinery and process. It follows from what has been said that the part of the third claim which is for a process is valid.

The first claim rests upon a different state of facts. I am inclined to the opinion that the patentee was the first inventor of his separator, but whereas the process was not completed until the agitators were put into the vats, which was in the fall of 1865, and until the use of caustic alkali, the separator had apparently been used for years prior to 1865, and thousands of bushels of starch had been made by its help. Its employment was no experiment by the inventor, but it was a completed and perfected piece of machinery, and had been permitted to be in public use for more than two years before the date of his application for a patent.

The novelty of the second claim, for the depositing table, is not pressed by the plaintiff.

The first part of the third claim is for the combination of the patented separator and the agitating vats, E and F, which were put into Gilbert's mill in 1865. Separators and vats having agitators were old, and had been used by the Messrs. Duryea. In their mill the ground and liquid mass went from the sieve first into settling tubs and next into the agitating tubs, in which the chemicals were placed, but the combination of the Gilbert separator and agitating vats was first made in 1865. This combination was important and valuable in producing the new and useful result which was obtained by the process and by all the machinery, and the mechanism by which these two important successive steps of screening and agitating with the alkali were taken, had not before been combined.

The four minor patents are next to be considered. The first in order of time is reissue No. 9,732, for a combination of agitator and flat vibrating sieve, so that the liquid having been agitated may be delivered to the sieve in a thin and uniform stream, and consequently one portion of the screen may not be more clogged with material than another, and better result in the screening may be obtained thereby. The original patent to Owens of January 14, 1868, was not limited to a flat vibrating sieve, although such a sieve was the one described in the specification. An agitator in combination with a revolving screen had been invented by Wright Duryea, and is shown in his patent of February 1, 1859. The combination of an agitator with a flat stationary sieve was also old at the date of the original patent. An attempt is made to show that the patentability of the Owens improvement consisted in the fact that an agitator with a flat vibrating sieve produced a delivery of better material to the

vat than when used in combination with a revolving bolt, and was peculiarly important when a vibrating sieve was used, but after agitators with revolving sieves, and agitators with flat stationary sieves, were known. I cannot see that there was anything patentable in an agitator with a flat vibrating sieve. The invention was fully shown in the Duryea patent, and was in use in the Duryea factory on Long island, and the introduction of the agitator between the stones and the vibrating sieve required no inventive faculty.

The patent to Colgate Gilbert, No. 81,888, dated September 8, 1868, is for an improvement upon J. J. Gilbert's starch separator or sieve, and consists mainly in the method of supporting the bolting frame, and also in the method of supporting the bolting cloth to keep it from "bagging." The novelty and patentability of this patent have not been successfully attacked.

Patent No. 78,320, to John A. Owens, dated May 26, 1868, was for forming the bottom of the trays or depositors of galvanized iron, instead of wood. The evil to be corrected was that, in shoveling the starch from the wet wooden bottoms, the shovel roughened the wood, and the ragged fibers created currents and deposits of the refuse with the starch. The substitution of iron for wooden bottoms, to remedy the defect complained of, does not constitute patentable invention.

Patent No. 137,911, to Colgate Gilbert, dated April 15, 1873, was for a series of adjustable supports to the bottom of the trays to prevent sagging. A cast-iron metal support is placed under the adjoining ends of two joists under the table. The lower end of the support is a square receptacle, in which is a screw having an adjusting nut. The other end of the screw rests in a hole in a supporting timber, the nut working upon the top of the timber. To raise or lower the table, the nut is turned the required distance. The novelty of this patent was not seriously attacked. It is a narrow invention, but I think it was patentable.

Each of the defendant corporations has used, for a series of years prior to the date of the bill, each one of the inventions which are described in the five patents.

Joseph J. Gilbert was a thriving manufacturer in Little Falls, and used about 100 bushels of corn per day in his starch-mill from 1867 to his death, in March, 1881. His brother, Colgate Gilbert, from 1868 to his death, in 1875, lived in Buffalo, and was largely engaged in the manufacture of starch by his brother's patented process, and was his sole licensee.

The firm of Fox & Williams, after the date of the process patent, was engaged in Buffalo in making starch from corn in order to convert it into glucose, or sugar, by the Gilbert process, up to and including the depositing on the table, and used the machinery described in J. J. Gilbert's patent of June 11, 1867.

On or about April 15, 1868, J. J. Gilbert brought an action at law in this court against Fox & Williams for the infringement of said

patent. This action was defended by said firm, was pleaded to, was noticed for trial by the defendants, and was discontinued on October 15, 1869, upon the payment to the defendants of their taxable costs. Fox & Williams continued to carry on the manufacture of starch in the manner aforesaid, and to use said machinery without objection from J. J. Gilbert until they sold out to the Buffalo Grape Sugar Company as hereinafter mentioned.

On or about April 15, 1868, a similar suit was brought by J. J. Gilbert against Fermenick & Williams, of Buffalo, who were making starch by said process up to and including the depositing on the tables, which suit was discontinued by the plaintiff on May 10, 1870. The defendants continued said manufacture without objection from J. J. Gilbert up to the time of his death. No other action was ever brought by said Gilbert against any infringing party, although there were various other infringers between 1868 and his death.

About January 10, 1874, Fox & Williams and the defendant William Hamlin organized the Buffalo Grape Sugar Company, to which company Fox & Williams' starch factory, with its appliances, was transferred, and said manufacture was continued by said company during J. J. Gilbert's life without objection. In 1878–9, and thereafter, it manufactured starch by the entire Gilbert process for the purpose of making glucose, and also made and sold laundry starch by said entire process. In 1874 it began to use the galvanized iron tables. In 1876 or 1877 it began to use the invention described in No. 137,911. In the fall of 1868 Fox & Williams began to use the improved sieve patented by Colgate Gilbert, September 8, 1868.

About 1878 the defendants Cicero J. Hamlin and William Hamlin became owners of the entire stock of the Buffalo Grape Sugar Company. From time to time said company expended large sums of money in the improvement and development of the business so conducted by said Buffalo Grape Sugar Company, and in adding to and improving the fixtures and machinery employed by the said company, without any interference or objection by or from Joshua J. Gilbert, or any notice from him that they were infringing any letters patent held by him. It was proved that some time in the year 1877 the American Grape Sugar Company was formed; that Thomas A. Jebb and William T. Jebb were stockholders to a large amount therein; that said company, under the personal management and direction of said Jebbs, erected at Buffalo works for the said company for the manufacture of glucose and grape sugar, and put the same in operation; that said Thomas A. Jebb was vice-president and a director of said company, and said William T. Jebb the treasurer and a director of said company; that in said grape sugar works, at the time of the purchase of the stock of the said Jebbs therein, as hereinafter set forth, said Jebbs were actively engaged as officers and managers of said American Grape Sugar Company in the manufacture of starch, substantially by the process used by said company at

the time of the commencement of this action against it; that said manufacture was so carried on by said American Grape Sugar Company without objection by or from said Joshua J. Gilbert; that thereafter the defendants Cicero J. Hamlin and William Hamlin became the owners of the majority of the stock of said American Grape Sugar Company, and thereafter, on or about the month of May, A. D. 1879, they bought two-fifths of the stock of said company, of the par value of $200,000, from the said Jebbs, and paid therefor more than $80,-000; that when said purchase was made said manufacture of starch was being conducted substantially so as aforesaid; that during said time the American Grape Sugar Company expended large sums of money in enlarging and improving its manufactory- at Buffalo, and in the development of the business carried on by it; that the several assignments to Phillip & Morgan, in said complaint mentioned, were in fact made by the procurement and for the benefit of the said Jebbs, and that, while they were the equitable owners of the rights conveyed thereby, the American Grape Sugar Company was engaged in the manufacture aforesaid, and in making improvements to its works for such manufacture, to the knowledge of said Jebbs, and that neither of them in any way forbade the said manufacture, or in any way notified said American Grape Sugar Company, or either of the defendants herein, that such manufacture, or any part or process thereof, would be an infringement of any or either of the patents in said complaint referred to, or in violation of the rights of themselves or any other person; that the business of said Fox & Williams was well known in Buffalo; that it was also well known in Buffalo, and by said Colgate Gilbert and Joshua J. Gilbert, that said Buffalo Grape Sugar Company succeeded to said business, and had greatly enlarged their manufactory for the production of glucose and grape sugar.

J. J. Gilbert owned all the patents soon after they were issued, except No. 137,911, and the original of reissue 9,732. The patents were bought for the Messrs. Jebb in December, 1880, and in January, 1881, and were assigned to the plaintiff on October 13, 1881, together with "all rights of recovery for past infringement thereof." Similar assignments of claims for damages for prior infringements were given to the Messrs. Jebb by their assignors. These suits were brought on October 14, 1881. The plaintiff was formed in August, 1881, but does not appear to have entered into the manufacture of starch or sugar.

Upon the facts which have been detailed, the defendants insist that the patents which were owned by J. J. Gilbert were abandoned to the public between 1869 and December 2, 1880, from the fact that he knowingly permitted them to be used by the defendants and the public. I perceive no substantial evidence of the abandonment of the process part of the 1867 patent, or of the subsequent patents. In April, 1868, he brought suits upon the 1867 patent against those who were using his existing machinery, and the process to and includ-

ing the deposit upon the table. These suits were discontinued. Subsequently, in the fall of 1868 and in 1874, his other patents began to be used. There is no evidence that he knew of the use by the defendants of the entire process, or of the patents granted after 1867. He knew that the Buffalo Company was largely manufacturing glucose or sugar, and very likely he knew the same fact in regard to the American Company, and I think that he did not concern himself with the question whether either of these companies was using his process and machinery, because the manufacture of glucose did not in his judgment interfere with his manufacture of starch. He deemed that he was not being injured by the glucose business, and he was therefore indifferent whether his process and machinery were being used or not; but in the absence of knowledge by the patentee of the improvement there was no abandonment of his patents. His position was that of a patentee whose patents are being used without his knowledge in such a manner that the business for the benefit of which the invention was made is not being injured or interfered with, and where his ignorance in regard to the use arises from an easy indifference to an infringement by persons whom he supposes are not in his line of business.

There is perhaps more evidence of an abandonment of the first part of the third claim of the 1867 patent, but taken in connection with the fact that the process part of the patent is the important portion, and was undoubtedly so regarded by the patentee and was not abandoned, there is not enough evidence to justify a finding of abandonment. On the other hand, I am of opinion that the present defendants did not know that they were infringing valid patents. The Buffalo Company was willing to obtain surreptitiously the advantage of Colgate Gilbert's knowledge and experience, but J. J. Gilbert's conduct in the management of his suits led them to believe that the patents were not of value or importance. Had he known that this company was manufacturing starch for the market, his attitude in maintaining his rights as a patentee might have been more positive and aggressive.

The American Grape Sugar Company next insists that the plaintiff took the title to these patents burdened by an equity in its favor arising out of the conduct of the Messrs. Jebb in purchasing the patents soon after they had sold out their interest in that corporation, having been its principal managers, and arising also out of their silence in permitting the company to make improvements while they were the owners of the patents; and further says that no injunction would be granted against it at the instance of the Jebbs, and therefore that none can be granted in favor of the plaintiff. The claim is not that the patents were abandoned by the Messrs. Jebb, but that there is an equity in favor of the American Company arising out of their conduct, which will prevent a decree for an injunction at the suit of the plaintiff.

The able argument of the defendants' counsel upon this point is founded, I think, upon a partial view of the facts. The American Grape Sugar Company was formed in 1877, and was managed by the Messrs. Jebb. Subsequently, the defendants Cicero J. Hamlin and William Hamlin became the owners of a majority of the stock, and in May, 1879, bought in addition two-fifths of the stock from the Messrs. Jebb. It was not until December, 1880, that the last-named gentlemen bought the patents. It does not appear that the sellers made any representations to the purchasers in regard to the value of the stock as connected with or disconnected from the patents, or in regard to their non-existence, and there is no evidence that the Messrs. Jebb knew of their existence prior to May, 1879. The Messrs. Hamlin, who were already owners of all the stock of the Buffalo Company, were not misled into buying the stock of the American Company by the Jebbs' suppression of the truth in regard to these patents, and the patents were not apparently bought because their existence and importance to the property of the company had been discovered by the Messrs. Jebb during their ownership of the stock. Under these circumstances, the purchase of the Jebbs 18 months after the sale of the stock does not make them trustees for the American Company, or prevent a new purchaser from having the ordinary rights of an owner of patents which are being infringed.

Again, it is said that an injunction should not issue because, during the period of the Jebbs' ownership of the patents, they saw in silence that the American Company was prosecuting its manufacture and was making improvements upon its property. I am not disposed to deny that cases may arise where a court of equity would refuse an injunction against an innocent infringer by reason of the protracted course of conduct of a previous owner of the patent who knew of the infringement, and silently and knowingly permitted the expenditure of substantial sums of money by the infringer. This case is not one of that class. The Jebbs owned from December, 1880, to October, 1881, and the proof is that during this time the American Company was engaged in the manufacture, "and in making improvements to its works for such manufacture, to the knowledge of the Jebbs," who were silent. Mere delay in seeking relief, when there is no estoppel, will not, in general, prevent an injunction, though it may preclude the plaintiff from the right to an account for past profits. *McLean* v. *Fleming*, 96 U. S. 245; *Merriam* v. *Smith*, 11 FED. REP. 588. Neither do the facts which the defendant has proved to have existed during the Jebbs' ownership create such an estoppel as to prevent an injunction, although they may be important in regard to an accounting. It is not enough simply to prove that during these 10 months the infringer was "making improvements to its works," without stating the character of the improvements or the extent of the expenditure. The proof is consistent with a very moderate expenditure of money. The very extensive business of the two defendant corpora-

tions and their large works had grown up before the purchase of the patents by the Jebbs, the capital which was embarked in the business was invested before 1880, and the silence of the Jebbs after 1880 did not, in my opinion, beguile the American Company into a continuation of the business or into renewed or a large expenditure.

The question in regard to the right of the plaintiff in a court of equity and under its bills to an account of the profits or an assessment of the damages which accrued prior to its ownership of the patents remains to be considered. The claims for profits or damages arising from infringements prior to the plaintiff's purchase are choses in action, and the assignee takes the title subject to all the equities existing against the assignors. Such claims do not pass by a mere assignment of the patent. In these bills there are no averments that the plaintiff is the owner of such claims. The title to the patents only, through the various assignments, is alleged, but the allegation of an assignment of the patent is not an allegation of an assignment of claims for past infringement. The prayer is for an accounting of the profits derived from a violation of the plaintiff's rights, and that there may be assessed the damages which the plaintiff has sustained by reason of the infringement. The bills neither show title in the plaintiff to the rights of recovery for past infringement, nor pray for an accounting to ascertain the amount which was due upon them, and no foundation was laid for a decree in regard to this class of claims. Had there been the necessary averments, I should have considered with care the question whether, under the circumstances of these cases, a court of equity ought to decree an account for the profits, or an assessment of the damages which accrued prior to the plaintiff's purchase of the patents, except in respect to patent No. 137,911.

Let there be a decree for an injunction against the respective defendants against the infringements of the third claim of patent No. 65,664, of patent No. 81,888, and of patent No. 137,911, and for an accounting in respect to the unlawful use of said patents since October 13, 1881; the terms of the decree to be settled upon hearing, if desired.