# THORN WIRE HEDGE COMPANY *v.* WASHBURN AND MOEN MANUFACTURING COMPANY.

# WASHBURN AND MOEN MANUFACTURING COMPANY *v.* THORN WIRE HEDGE COMPANY.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

Nos. 57, 58. Argued April 29, 30, 1895. —Decided November 11, 1895.

The parties to these suits having had extensive dealings founded upon mutual agreements and arrangements respecting the manufacture of and licenses to manufacture patented articles, and having had serious misunderstandings touching their accounts, came to an agreement whereby the Thorn Company, in consideration of the sum of $10,000 paid to it by the Washburn and Moen Company, released and discharged the latter from all claims and demands of every kind and nature whatso-

ever, which it had or could have against that company for and on account of any moneys, properties, or valuable things which the Washburn Company had received from any persons in settlement for damages or profits accruing to it, on account of infringements committed upon any letters patent, and also on account of any moneys which it had received by way of bonuses or premiums paid to it by parties receiving licenses from it; and discharged and released the Washburn Company from any obligation to account to the Thorn Company for any sums which it might thereafter receive in settlement of claims for damages for infringements prior to the date of that agreement, or for moneys which it should thereafter receive for bonuses or premiums for licenses. The parties worked under this agreement for several years, the Washburn Company paying and the Thorn Company receiving, without objection, from time to time considerable sums as royalties, etc., due thereunder, the Washburn Company settling with parties from whom the royalties were due, sometimes receiving cash in full, sometimes notes, and sometimes compromising on receipt of a lesser sum. After the lapse of about eight years the Thorn Company filed its bill in equity to set aside the agreement and the settlements made under it, claiming that it was entitled to a much larger sum than it had received; and the Washburn Company in its answer denied this claim and filed a cross-bill claiming to recover from the Thorn Company large sums which it had been obliged to yield to licensees in compromising settlements with them. *Held,*

(1) That the agreement released the Washburn Company from claims for damages due at its date, but received subsequent thereto, and from claims for royalties due on its own products, or products of its licensees sold prior to its date;

(2) That under the circumstances disclosed it was not open to the Thorn Company to claim that $10,000 was not a sufficient consideration for such release;

(3) That the Thorn Company, by receiving, for so long a period, royalties as accruing and receipting for them as collected without challenging the accounts rendered, and by its delay in setting up claims for moneys received by the Washburn Company before the date of the agreement, and its delay in contesting settlements and compromises made by that company, must be deemed to have acquiesced in the construction put upon the contract by the Washburn Company, and to have assented to its settlements with licensees; and that the evidence showed no want of diligence or good faith by the latter company in this respect;

(4) That the Washburn Company was not entitled to recover the sums claimed in its cross-bill.

IN the year 1875 the Washburn and Moen Manufacturing Company, a Massachusetts corporation doing business at Worcester, Massachusetts, was engaged extensively in the

manufacture of wire.  Having had its attention directed to barbed fence wire, an article then little known or used, the company determined to begin the making of it, conceiving that the future demand for such wire might serve to increase the output of its mill.  There being no machine then in use for making barbed wire by steam power, the company contracted with H. W. Putnam, of Bennington, Vermont, for the invention of one; and in the fall of 1875 such a machine was made in accordance with Putnam's plans, and a patent for it granted to him on February 15, 1876.  The rights of Putnam in the invention were purchased by the company on September 28, 1875, the consideration being the sum of 25 cents per 100 pounds on all barbed fence wire that might thereafter be made by the company and its licensees, the company reserving the right, however, to cease the payment of such sums by paying at any time a sum of money which, added to the amounts previously paid, should equal $150,000.

The persons engaged in the barbed wire business in the spring of 1876 were J. F. Glidden and I. L. Ellwood, of De Kalb; Jacob Haish, of De Kalb; H. B. Scutt, of Joliet, and Charles Kennedy, of Aurora, all of the State of Illinois; Doolittle & Co., (licensees of Kennedy,) of Bridgeport, Connecticut, and the Thorn Wire Hedge Company, a corporation organized under the laws of Illinois, and having its place of business at Chicago.

Various patents had been granted for barbed fence wire and machines for making the same, and of these J. F. Glidden, I. L. Ellwood, and Charles Kennedy owned the W. D. Hunt reissued patent No. 6976, dated March 7, 1876, and the L. B. Smith reissued patent No. 7137, dated May 23, 1876; J. F. Glidden and I. L. Ellwood owned the J. F. Glidden patent, No. 157,124, dated November 24, 1874, and the J. F. Glidden reissued patents, No. 6913 (division A), dated February 8, 1876, and No. 6914 (division B), dated February 8, 1876, being divisions of a reissue of an original patent, No. 150,683, dated May 12, 1874; Charles Kennedy owned the Charles Kennedy patents, No. 153,965, dated August 11, 1874, and No. 164,181, dated June 8, 1875; Jacob Haish owned, besides other patents,

the Jacob Haish patent, No. 167,240, dated August 31, 1875; and the Thorn Wire Hedge Company owned the Michael Kelly reissued patent, No. 6902, dated February 8, 1876, and the Michael Kelly reissued patents, No. 7035 (division A), dated April 4, 1876, and No. 7036 (division B), dated April 4, 1876, being divisions of a reissue of an original patent, No. 84,062, for an improvement in "metallic fences," dated November 17, 1868. Of the machine patents, the Washburn and Moen Manufacturing Company owned the Putnam patent; J. F. Glidden and I. L. Ellwood owned the J. F. Glidden and P. W. Vaughan patent, No. 157,508, dated December 8, 1874; and the Thorn Wire Hedge Company owned the E. W. Mitchell patents, No. 172,760, dated January 25, 1876, and No. 173,491, dated February 15, 1876.

On May 10, 1876, the Washburn and Moen Manufacturing Company purchased the interest of J. F. Glidden in the said Hunt, Smith, and Glidden wire patents, and in the Glidden and Vaughan machine patent, paying him therefor the sum of $60,000, and agreeing to pay him, in addition, 25 cents per 100 pounds on all wire manufactured and sold under those patents after the date of the purchase; and on the 23d of the same month the company bought of Kennedy his own patents, and his interest in the Hunt and Smith patents, the consideration being the payment to him of 25 cents per 100 pounds on all wire that should thereafter be manufactured and sold under the patents in which the company, by this purchase, acquired his interest, until the aggregate of the amounts paid should equal $100,000.

At the same time that the Washburn and Moen Manufacturing Company purchased the interest of Glidden in the patents, it purchased also his interest in the manufacturing business of Glidden and Ellwood, and a new partnership was formed for the purpose of making barbed fence wire at De Kalb, Illinois, under the style of I. L. Ellwood & Co.; C. F. Washburn, as trustee of the company, becoming a partner with Ellwood.

On July 3, 1876, the company purchased of the Thorn Wire Hedge Company the said Kelly patents, agreeing to pay for them, as appears by a contract in writing executed by the com-

panies on that date, the sum of $37\frac{1}{2}$ cents per 100 pounds upon all barbed fence wire which the Washburn and Moen Manufacturing Company should manufacture and sell and cause to be manufactured and sold, under the said (Kelly) patents, or any one of them, and also upon all barbed fence wire which might be manufactured and sold by others under any license which might be granted by it under the said patents, or any one of them, for which pay should have been received by such licensees, for and during the term of the said patents. It was agreed, as further appears by the written contract, that the Washburn and Moen Manufacturing Company should keep separate and accurate accounts of the entire product manufactured and sold under the said patents, and of the part of the product for which they should actually receive pay in any form ; that the Washburn and Moen Manufacturing Company should enter upon the manufacture of barbed fence wire under the said patents, and should use reasonable and diligent efforts "to supply the demand for this article" throughout the country, and should also use proper and reasonable diligence in prosecuting infringers of the said patents, or any of them, to the end that the said patents might be fully enforced and sustained ; that the consideration received by the Thorn Wire Hedge Company for the said patents was to be the payment to them of the percentage upon sales as above specified, and that if at any time the Washburn and Moen Manufacturing Company should, for any reason whatever, discontinue permanently the manufacture of barbed fence wire under the said patents, then the said patents should be retransferred to the Thorn Wire Hedge Company within ninety days from the receipt of a written demand from it for such retransfer ; that the Thorn Wire Hedge Company should assign all its interest in all claims for damages and profits for past infringements of the said several patents and each of them ; and that the Washburn and Moen Manufacturing Company might prosecute in the name of the Thorn Wire Hedge Company all suits that they might wish to institute against past infringers of the said several patents, or any of them. The agreement also contained, among other provisions, the following : "Said Washburn and Moen

Manufacturing Company, party of the second part, agrees that three-eighths of one cent per pound shall be paid on all the barbed fence wire which was made by Glidden and Ellwood and I. L. Ellwood & Company, from the dates of the several reissue patents aforesaid up to the date hereof; and also the same amount per pound upon all wire upon which they shall recover from past infringers of said reissue patents, or either of them, under any suit or suits which they may hereafter institute and prosecute to final judgment, or which may be settled without judgment by payment of royalty by the defendants."

At the same time, July 3, 1876, the Thorn Wire Hedge Company assigned the said Mitchell patents to the Washburn and Moen Manufacturing Company, and the latter granted to the former a license to use the Mitchell machines, under the Mitchell patent, at a single shop or factory in Chicago, or elsewhere, and a license to manufacture and sell the forms of wire described in the Kelly patents at a single shop or factory in that city, or elsewhere after giving thirty days' notice of intention to remove.

The Washburn and Moen Manufacturing Company and I. L. Ellwood & Company began the manufacture and sale of barbed fence wire in the spring of 1876. The rights which the company asserted under the patents acquired by it were not at once generally acquiesced in, and the making and selling of barbed fence wire was for a time carried on by a few persons without the company's authority. Licenses were granted on December 7 and 18, 1878, to the Ohio Steel Barb Fence Company, of Cleveland, Ohio, and to H. B. Scutt, doing business as H. B. Scutt & Co., (successor to the Joliet Wire Fence Company,) of Joliet, Illinois. In granting these licenses the company released all claims it might have against the licensees on account of damages for past infringement of its patents. The company granted no other licenses until January, 1881.

Some matters of dispute having arisen between the Thorn Wire Hedge Company and the Washburn and Moen Manufacturing Company as to the time in which payments were to be made on wire previously made by the firm of Glidden &

Ellwood, and the suggestion having been made by the latter company that the former, in using the Mitchell machines, was infringing the Putnam patent, and it being thought for some reason that the 37½ cents per 100 pounds provided for in the agreement of July 3, 1876, should be reduced, the companies, on December 2, 1878, executed another agreement, as an amendment and supplement to that of July 3, 1876. This contract made provisions adjusting the matters of difference between the companies, and reduced the amount required to be paid to the Thorn Wire Hedge Company to 25 cents per 100 pounds. A portion of the contract was as follows: "The party of the first part [the Washburn and Moen Manufacturing Company] hereby covenants and agrees that it will make monthly reports of the amount of wire reported as sold by each of its licensees, said report to be on or before the 15th of each and every month, and to embrace the report of the sales of the licensees made during the previous month, or any month not previously reported, and that it will pay over to the party of the second part, or its legal representatives, the money that it collects of said licensees, that is to be paid to the party of the second part hereto quarterly; that is to say, on or before the last day of each January, April, July, and October it will pay the party of the second part such proportion of the money that it has received from its licensees during the previous quarter as royalties, as one-fourth of a cent per pound is to the entire amount per pound which said licensees agree to pay as royalty; and the said party of the second part hereby agrees to waive and does hereby relinquish any and all claim on the said first party, for royalties on barbed wire, made by its licensees, which it may so fail to collect, after using due diligence and lawful means to collect the same, but in that case the party of the first part shall make a report to the party of the second part of all such royalties as it shall fail to collect and from whom due and the cause of such failure to collect, and the first party agrees to make each of its licensees agree to pay it for the second party one-quarter of a cent a pound on all the barbed wire it makes and sells during the term of the Kelly patents, and to use its best endeavors to

collect the same." The agreement also provided: "And the party of the second part also releases all right and claim it may have on the party of the first part and the parties hereinafter named on account of the infringement of any of the Kelly patents, so called, which it formerly owned, by the Ohio Steel Barb Fence Company, Jacob Haish, the Joliet Wire Fence Company and H. B. Scutt, and James Ayres and Alexander C. Decker and their customers on account of selling their respective barbed wires; provided, however, the party of the first part makes a settlement with them or either of them whereby it condones or waives the past royalties or damages in the settlement of the suits which it, or it and I. L. Ellwood now have pending against them or either of them, then and in that case the party of the second part releases as aforesaid as to the party so settled with."

About the time such reduction was made in the amount required to be paid to the Thorn Wire Hedge Company, reduction was also made by another of the assignors, thus reducing the aggregate of the amounts to be paid by the Washburn and Moen Manufacturing Company to the assignors of the patents, to $87\frac{1}{2}$ cents per 100 pounds.

As already shown, the Washburn and Moen Manufacturing Company, a short time after the execution of the agreement, granted licenses to the Ohio Steel Barb Fence Company and H. B. Scutt & Co. Other persons engaged in making barbed wire refused, however, to become licensees and pay royalty, and in January, 1879, they formed an association for the purpose of resisting the efforts which, by litigation and other means, were being made by the company to stop infringement by them of the patents, and to induce them to take licenses. The Ohio Steel Barb Fence Company reported sales of wire under its license for the months of March, April, and May, 1879, but refused to pay royalties after April 30, 1879. H. B. Scutt & Co. continued to manufacture under their license, and paid royalty at the rate of $137\frac{1}{2}$ cents per 100 pounds.

On August 7, 1879, the Washburn and Moen Manufacturing Company and the Thorn Wire Hedge Company executed a third agreement, supplemental to the contracts of July 3,

1876, and December 2, 1878, a part of which was as follows: " That for the purpose of increasing the manufacture and sale of the barbed fence wire mentioned in said agreements and license, and inducing other parties to pay royalties thereon, it is mutually agreed by the parties hereto that the party of the second part [the Thorn Wire Hedge Company] will reduce the amount to be paid to it per pound by the party of the first part on all barbed fence wire hereafter manufactured or caused to be manufactured and sold by it, as provided by the said contracts of July 3, 1876, and December 2, 1878, to 15 cents per 100 pounds; and it is understood and agreed that all the provisions and agreements hereinbefore referred to, relating to the price per pound in said agreements agreed to be paid by the party of the first part to the party of the second part, shall apply to the price per pound to be paid as reduced by this supplemental agreement; and the said party of the first part agrees to reduce the royalty or amount required to be paid to it on account of its ownership of any patents used in the manufacture of said wire by it or its licensees, or persons manufacturing or selling barbed fence wire under its authority, or who shall hereafter be so licensed by it, to at least seventy-five cents per hundred pounds of said barbed fence wire so manufactured and sold."

Reductions were also made by other assignors, so that after August 7, 1879, the aggregate of the amounts required to be paid by the Washburn and Moen Manufacturing Company on account of the various patents was $68\frac{3}{4}$ cents per 100 pounds.

On August 10, 1879, the company reduced the royalty payable to it by H. B. Scutt & Co. to $81\frac{1}{4}$ cents on general sales and $56\frac{1}{4}$ cents on Texas sales; and on August 1, 1880, a further reduction was made to 50 cents on all sales of that firm.

The company and I. L. Ellwood continued the prosecution of suits against alleged infringers of the patents, and in 1880 about fourteen of these suits were pending in the Circuit Court of the United States for the Northern District of Illinois, and were being contested by the association of unlicensed manufacturers. A final decision was reached in the cases on De-

cember 15, 1880, by which the Kelly reissued patent No. 6902 and the Hunt and Glidden patents were held valid, and subsequently decrees were entered referring the causes to a master to ascertain and report the amounts of damages. The Kelly reissued patent No. 7035, in so far as it may have been relied upon to affect the cases, was held invalid. It did not appear to the court that any of the defendants had infringed the Smith patent, and, therefore, the question of its validity was not passed upon. *Washburn & Moen Manufacturing Co.* v. *Haish,* 4 Fed. Rep. 900; 7 Fed. Rep. 906. After this decision was announced, a large number of manufacturers recognized the rights asserted by the company under the patents, and applied to it for license. C. F. Washburn, vice-president of the company, and I. L. Ellwood met the applicants in the city of Chicago, and in January and February, 1881, granted more than forty licenses. Each of the persons licensed paid to the company either damages for past infringement, estimated at 60 cents per 100 pounds on all wire that the licensee had theretofore made, or a bonus of from five to ten dollars for each ton of wire authorized to be made in any one year thereafter, and in most instances both damages and bonus were exacted. The company also required all the licensees, except two, to assign to it whatever patents they owned.

The licenses were printed, and were all of the same form, with the exception of the date, name of licensee, and amount of tonnage authorized; and each license provided for the payment of royalty at the rate of three-fourths of a cent per pound. The printed form contained this provision: "And the royalty to be paid under this license shall not be greater than that charged to any other party licensed after the —— day of December, A.D. 1880, under the said several letters patent, or any of them, hereinbefore mentioned by date and number, by said Washburn and Moen Manufacturing Company; that is, if said Washburn and Moen Manufacturing Company shall hereafter conclude to and does license any other party or parties during the continuance of this license to manufacture and sell barbed fence wire in the United States and Territories, and this license is confined to the United States and Territories, under

said letters patent, or any of them, hereinbefore mentioned by date and number, at a less sum per pound than ——— of a cent, then and thereafter the royalty to be paid by said ——— to said Washburn and Moen Manufacturing Company under this license shall be the same as such reduced royalty."

When the licenses were granted in January and February, 1881, the Thorn Wire Hedge Company requested Mr. C. F. Washburn to furnish it a statement of the amount of the said back damages and bonuses. The statement not being furnished, the Thorn Wire Hedge Company wrote to the Washburn and Moen Manufacturing Company on March 21, 1881, saying: "We have not yet received report of sales for month of February, nor official notice of settlements with the various infringing companies, all of which should be due by the 15th of this month." On the 28th of the same month the Washburn and Moen Manufacturing Company answered: "With reference to official notice of settlements with the various infringing companies, etc., we shall defer making our report on that subject until we have had an opportunity of seeing Mr. Ellwood here in Worcester, which will happen early in the month of April." On April 25, 1881, the Washburn and Moen Manufacturing Company wrote again, to the effect that it was under no obligation to pay the Thorn Wire Hedge Company any part of the damages recovered or received in settlement for past infringement of the patents, or any part of the bonus money. The Thorn Wire Hedge Company answered this letter on May 16, 1881, and submitted an opinion of its counsel, asserting its right to a share in the back damages.

More correspondence followed, but no adjustment of these differences between the companies was made until one was effected by an agreement in writing, dated July 27, 1881. About that time there was also made what is called in the testimony and argument the "Haish settlement," which it is necessary here to explain.

Jacob Haish was one of the persons against whom the above-mentioned decision was rendered at the suit of the Washburn and Moen Manufacturing Company on December

15, 1880. An interlocutory decree had previously been entered requiring Haish to pay into court an amount equal to 75 cents per 100 pounds on all wire made by him after such decree, and up to the entry of the final decree against him he had paid into court the sum of $25,000. After the decision of December 15, 1880, Haish, instead of following the course which was adopted by all the other defendants and making settlement with the company, refused to become its licensee, and continued his opposition to its patents. This placed the company, as it believed, in a very unfavorable position. Haish was the owner of patents which the company feared might be used by him to disturb its licensees, and for various reasons his persistent opposition was regarded by the company as harmful to its interests. Vigorous efforts were therefore made to effect a settlement with him, and these resulted in a statement by him on June 29, 1881, of the terms upon which a settlement would be consented to. The terms proposed by him were, (1) a release from all claims for back damages; (2) each party to pay his own costs in court; (3) a license to him from the company to manufacture 10,000 tons of barbed wire a year, he to pay royalty at the rate of 75 cents per 100 pounds; (4) he to assign to the company all his patents and to receive from it an exclusive license under the same; (5) the company to pay him for the patents $10,000 cash and 75 cents per 100 pounds on all barbed wire made by himself up to the quantity of 4000 tons per year, and the further amount of 25 cents per 100 pounds on the next 4000 tons made by him in the same year.

Under date of July 26, 1881, the Washburn and Moen Manufacturing Company and Haish executed an agreement in writing which recited that the company had theretofore granted divers licenses under several patents for barbed wire fencing and for machinery; that Haish claimed that some of the licensees were infringing patents owned by him; that for the better protection of the licensees it had become necessary for the company to acquire, by purchase from Haish, all his patents relating to barbed fencing or machinery; that Haish, by an instrument of even date, had assigned all his patents to

the company, and transferred to it all claims for damages for the infringement of the same, and had released the company and its licensees from all claims for damages for infringement of the patents; and that Haish had accepted·from the company a license to manufacture 10,000 tons of barbed fence wire annually under the patents, and agreed to pay royalty at the rate of 75 cents per 100 pounds.    The agreement then provided, in substance, that the company or its licensees should manufacture 8000 tons of barbed fence wire every year until February 27, 1894, and should pay to Haish until that time 75 cents per 100 pounds on the wire so manufactured not exceeding 4000 tons each year, and a further sum of 25 cents per 100 pounds on any excess over that quantity each year, up to, but not exceeding, 4000 tons; that the company should not, however, pay any part of such sum to Haish unless he should first have paid or tendered to the company, as royalty under the license accepted by him, a sum equal to the amount which he should demand from the company.

On the same day Haish assigned his patents to the company and Ellwood, and released the company and its licensees and Ellwood from all damages for past infringement of the same, and received from the company the license mentioned in the recitals of the above agreement, and exclusive licenses to make barbed fence wire and to use machinery under the patents assigned by him to the company without paying royalty.    He also received from the company and Ellwood a release of all claims for damages for infringement of their patents, and the company paid him the sum of $10,000 in cash, and agreed that he might withdraw the money which he had paid into court, and that decrees might be entered in the suits against him for nominal damages without costs.

Under date of July 27, 1881, the Thorn Wire Hedge Company executed the following instrument: "In consideration of the sum of one dollar and other valuable considerations to it paid, the Thorn Wire Hedge Company, a corporation duly organized under the laws of the State of Illinois, and located at the city of Chicago, in said State, does authorize the Washburn and Moen Manufacturing Company and Isaac L. Ellwood

to make settlement with Jacob Haish, of De Kalb, Illinois, for his past infringements of the letters patent for barbed fence wire and machinery for making the same, owned by the Washburn and Moen Manufacturing Company, or by said company and Isaac L. Ellwood, and to grant to the said Haish a license to manufacture and sell annually ten thousand tons of barbed fence wire under said patents, as provided in a proposed agreement between the Washburn and Moen Manufacturing Company and the said Jacob Haish, and assented to by Isaac L. Ellwood, (copies of which proposed agreement and license being hereto attached,) and does release the said Washburn and Moen Manufacturing Company from all its agreements with the said Thorn Wire Hedge Company, dated respectively July 3, 1876, December 2, 1878, and August 7, 1879, to account for any proportion of the moneys received from the said Jacob Haish whether in settlement of past infringements or for royalties hereafter paid under the said license, which may be required to be expended or remitted in the settlement with said Jacob Haish, or in payment of the consideration money for the transfer and conveyance of all the patent rights to letters patent and inventions, which are or shall be conveyed by the said Haish to the said Washburn and Moen Manufacturing Company and Isaac L. Ellwood, as provided in said proposed agreement."

On the same day that the settlement with Haish was consummated the companies, as already stated, reached an agreement with regard to the back damages and bonuses. This agreement was expressed in an instrument of writing, bearing date July 27, 1881, a portion of which was as follows:

"Whereas there are certain agreements in writing subsisting between the parties above named, bearing date, respectively, July 3, 1876, December 2, 1878, and August 7, 1879, to which reference may be had for all matters therein contained; and whereas the Thorn Wire Hedge Company claims that under the effect of said agreements it is entitled to a share of the damages or moneys or other valuable things which the Washburn and Moen Manufacturing Company have received from the different persons, firms, or corporations who have infringed

upon the patents owned by the said Washburn and Moen Manufacturing Company and I. L. Ellwood, and have accepted licenses from them to manufacture barbed fence wire under the several patents owned and controlled by them; and also claims that it is entitled to share in certain bonuses or premiums which have been paid by various licensees for the privilege of obtaining a license; and for other causes makes other claims for damages or compensation on various grounds against said Washburn and Moen Manufacturing Company :

"Now, therefore, in consideration of the premises and of the sum of ten thousand dollars to it paid, the said the Thorn Wire Hedge Company does by these presents hereby release and discharge the said Washburn and Moen Manufacturing Company from all claims or demands of every kind and nature whatsoever, which it has or can have against said company for and on account of any moneys, properties, or valuable things which the said Washburn and Moen Manufacturing Company has received from any persons in settlement for damages or profits accruing to it, or to it and I. L. Ellwood, on account of infringements committed upon any letters patent for barbed fence wire or machinery for making the same, and also for and on account of any moneys which it has received by way of bonuses or premiums paid to it by parties receiving licenses from it and from I. L. Ellwood to manufacture barbed fence wire; and does also discharge and release the said Washburn and Moen Manufacturing Company from any obligation to account to the Thorn Wire Hedge Company for any sums of money or valuable things which it shall or may hereafter receive or acquire from any parties in settlement of suits or claims for damages for the infringements, prior to the date of this agreement, of letters patent owned by the said Washburn and Moen Manufacturing Company, or by it and I. L. Ellwood, or for moneys which it shall hereafter receive for bonuses or premiums paid for licenses.

" Furthermore, in the execution of the existing agreements between the parties, bearing date July 3, 1876, December 2, 1878, and August 7, 1879, before referred to, providing for

the payment of fifteen cents by the Washburn and Moen Manufacturing Company to the Thorn Wire Hedge Company, as consideration money for the Kelly patents, upon every one hundred pounds of barbed fence wire manufactured and sold by it, or its licensees, or by its authority, the said the Thorn Wire Hedge Company does release and surrender any claim against the Washburn and Moen Manufacturing Company for any share in or proportion of the license fees or royalties which it shall receive from Jabob Haish, under the agreement between the Washburn and Moen Manufacturing Company and the said Jacob Haish, (a copy of which has been furnished to the Thorn Wire Hedge Company,) which shall be required under said agreement to be applied by the Washburn and Moen Manufacturing Company or used in the payment of any consideration for the purchase from said Haish of certain patent properties, and the release of claims for infringements against licensees under said agreement."

As heretofore stated, most of the manufacturers of barbed fence wire throughout the country applied to the Washburn and Moen Manufacturing Company in January and February, 1881, and obtained licenses. Subsequently, however, some persons in Iowa and Missouri began manufacturing without license, and the company thereupon brought suits against them for infringement of the patents which had been held valid in the Northern District of Illinois. The Circuit Court of the United States for the Eastern District of Missouri, in which some of these cases were heard, decided adversely to the company on June 4, 1883, holding that the Kelly and Glidden reissued patents were void. *Washburn and Moen Manufacturing Company* v. *Fuchs,* 16 Fed. Rep. 661. This decision, although its direct effect was confined, of course, to the States composing the Eighth Circuit, tended greatly to weaken the company's control over the barbed wire business, and in order to maintain its position as a receiver of royalties it became necessary for it to reduce the royalties required to be paid by its licensees to 30 cents per 100 pounds. The more important of the Kelly patents having been held valid in the Seventh Circuit, the company was not disposed to exercise its

option, provided for in its contract with the Thorn Wire Hedge Company of July 3, 1876, of discontinuing its manufacture under those patents and reassigning them to the last named company, but entered into an agreement in writing with that company, dated June 12, 1883, by which the Thorn Wire Hedge Company agreed to reduce the amounts to be paid to it to five cents per 100 pounds, and to shorten the time for which the payments should continue to be made from November 17, 1885, to February 12, 1885. Among the provisions of this agreement were the following:

"Seventh. Said Washburn and Moen Manufacturing Company agree to pay said reduced royalty of five cents on each and every one hundred pounds of barbed fence wire which it shall license to be made, or which shall be sold under a license from it, on and after June 1, 1883, to and including February 11, 1885. Payments of said reduced royalty of five cents for each one hundred pounds on licensed wire to be made in accordance with the said original agreement and the amendment thereof; but no payments or royalty on licensed wire to be made until it shall have been first collected by said Washburn and Moen Manufacturing Company.

"Eighth. Said party of the second part [the Washburn and Moen Manufacturing Company] further covenants and agrees with the party of the first part, its successors or assigns, that it will pay the said reduced royalty of five cents per one hundred pounds to the party of the first part, its successors or assigns, on the barbed wire made and sold by itself, I. L. Ellwood & Co., or its licensees, at the time, in the manner, and on the same terms and conditions as payments are now required to be made by the provisions of the agreements now existing between the parties hereto, and that such payments when due and payable shall be promptly and punctually made to said party of the first part, or its successors or assigns, without any delay or rebate on account of any claim or demand, or question of claim or demand, of said party of the second part, or said I. L. Ellwood & Co., against said party of the first part, and independently of any and all questions of dispute or otherwise which may arise between said party of

the first part and said party of the second part, or said I. L. Ellwood & Co., or any or either of them."

After February 12, 1885, the Thorn Wire Hedge Company made certain demands upon the Washburn and Moen Manufacturing Company, asserting that that company had failed in various ways to perform its obligations under the several contracts. The justice of these demands having been denied, the Thorn Wire Hedge Company, on June 6, 1887, filed its bill in equity in the Superior Court of Cook County, Illinois, against the Washburn and Moen Manufacturing Company, setting up the grounds of its complaint and praying for discovery and an accounting. Upon petition of the defendant the cause was removed, on June 21, 1887, into the Circuit Court of the United States for the Northern District of Illinois, where the defendant company filed its answer on July 2, 1887. After the greater part of the testimony had been taken, the complainant, on June 19, 1889, filed an amended bill, and the defendant, on the 21st of the same month, filed an amended answer and a cross-bill. The complainant filed its answer to the cross-bill on June 29, 1889. The taking of testimony was resumed and completed, and the cause having been heard in the said Circuit Court upon the pleadings and evidence a final decree was entered on November 29, 1889, dismissing both the bill and the cross-bill for want of equity. Thereupon both parties appealed to this court.

*Mr. George C. Fry* for the Thorn Wire Hedge Company.

*Mr. F. W. Lehmann* and *Mr. C. C. Washburn* for the Washburn and Moen Manufacturing Company.

MR. JUSTICE SHIRAS, after stating the case as above reported, delivered the opinion of the court.

This record contains nearly thirteen hundred pages, consisting chiefly of evidence. There were no findings of facts, nor did the court below file any opinion. It has hence been necessary to make a long statement, of no interest except to the parties, which will occupy many pages of the reports.

The Thorn Wire Hedge Company sought, by its bill of

complaint, to compel the Washburn and Moen Company to account for moneys claimed to be due under certain contracts subsisting between the companies.

It was one of the provisions of those contracts that the Washburn and Moen Company should pay, at a stipulated rate, a royalty upon all barbed fence wire which should be manufactured and sold by third parties under licenses granted them by said company; and one of the complaints in the bill is that the Washburn and Moen Company had not correctly reported to the complainant, from time to time, the issuing of licenses and the amount of moneys collected or of settlements made. Further complaints are that the Washburn and Moen Company had, in some instances, accepted notes from its licensees, and refused to account to complainant for its proper share thereof; that the Washburn and Moen Company had received moneys from infringers for damages and certain bonuses, which had not been accounted for; and that, after the making of the supplemental agreement of August 7, 1879, whereby the rate of royalties to be paid by the licensees was reduced, the Washburn and Moen Company did not, in point of fact, in some cases, reduce said royalties, but continued to collect at the old rate, and had failed to account therefor. To meet these charges the Washburn and Moen Company put in evidence the agreement and release, dated July 27, 1881. Thereupon the complainant amended its bill by adding allegations respecting the said release, seeking to have it declared void because executed in ignorance of all the facts and because the complainant was fearful that legal proceedings against the Washburn and Moen Company would imperil complainant's royalties for the remaining four years of the term of contract. The Washburn and Moen Company, by amendments to its answer, denied the allegations attacking the release and settlement, and averred that the complainant had executed the same with full knowledge.

Did this agreement of July 27, 1881, legally import a settlement and release of the claims in question? and, if so, were the facts and circumstances attending its execution such as to relieve the complainant from its operation?

The complainant's contention is that the release was, when drawn and executed, intended only to apply to the bonuses and damages received by and unaccounted for by the Washburn and Moen Company prior to the date of said release; that it does not purport to release that company from back damages received subsequent to its date, or for royalty due upon the product of the Washburn and Moen Company, or upon the product of its licensees previously sold under licenses granted by said company.

We are unable to accept this view of the scope and effect of the release. Its language plainly was that, in consideration of the payment of ten thousand dollars and of a release by the Washburn and Moen Company of certain specified claims made by said company against the company complainant, the latter would and did "release and discharge the said Washburn and Moen Manufacturing Company from all claims and demands of every kind and nature whatsoever, which it has or can have against said company for and on account of any moneys, properties, or valuable things which the said Washburn and Moen Manufacturing Company has received from any persons in settlement for damages or profits accruing to it, or to it and I. L. Ellwood, on account of infringements committed upon any letters patent for barbed wire fence or machinery for making the same, and also for and on account of any moneys which it has received by way of bonuses or premiums paid to it by parties receiving licenses from it and from I. L. Ellwood to manufacture barbed fence wire; and does also discharge and release the said Washburn and Moen Manufacturing Company from any obligation to account to the Thorn Wire Hedge Company for any sums of money or valuable things which it shall or may hereafter receive or acquire from any parties in settlement of suits or claims for damages for the infringements, prior to the date of this agreement, of letters patent owned by the said Washburn and Moen Manufacturing Company, or by it and I. L. Ellwood, or for moneys which it shall hereafter receive for bonuses or premiums paid for licenses."

It is, indeed, true, as argued by complainant's counsel, that general expressions in a release may not carry its effect

beyond the particular matters which the parties had in view, but the language in the present instance seems to us to be clear and explicit, and to be unmistakably applicable to the matters complained of in the bill.

But it is claimed that, in the circumstances disclosed by this record, a court of equity should not permit the release to stand.

The first reason urged is that the payment of ten thousand dollars was not a sufficient consideration for the release. It has often been held that where the party executing the release, by reason of youth or advanced age, was incapacitated to act judiciously, or where the release was executed during the existence of fiduciary relations, calculated to beget unquestioning confidence, courts of equity will grant relief where the consideration was plainly inadequate. It is enough to say that the present is not such a case. The parties, in respect to their capacity to act, stood upon an equal footing. We are scarcely prepared to extend a doctrine, devised in equity to protect those who are disabled by age or inexperience, to cover the case of a business corporation, whose affairs are managed by a president and board of directors. Moreover, it is not clear that the consideration, in the present case, was inadequate. While it is true that the evidence tends to show that, upon the theory of the complainant's bill, a much larger sum than ten thousand dollars was due, yet the release discloses that, in addition to the payment of that amount, and as a further consideration, the Washburn and Moen Company released the complainant from claims theretofore made by the former, and also agreed to protect the complainant from any suit for infringement of the patents held by Jacob Haish.

The validity of the release is also assailed because neither the complainant nor its counsel were fully advised as to the facts, and because the Washburn and Moen Company falsely misrepresented and fraudulently concealed the facts from the complainant.

This contention presents an issue of facts under the allegations of the amended bill and answer. Although an oath to the answer was waived and thereby the force of the latter

as evidence was prevented, still the burthen of proof to set aside a settlement deliberately executed is upon the complainant, and that burthen is greatly increased by the fact that eight years had elapsed before the complainant attempted to avoid the operation of such settlement by the allegations of its amended bill.

We do not think it necessary to extend this opinion by a minute analysis of the evidence adduced under this issue. That evidence consists of a large amount of testimony and of a correspondence by letter between the parties for a period of several years. We have examined and considered this evidence and the full and able discussion of it found in the briefs of the counsel. Our conclusion is that the complainant has failed to show such a state of facts as would warrant a court of equity in holding the release and settlement of July 27, 1881, to be void, either for gross inadequacy of consideration, or by reason of any false statements or fraudulent concealment on the part of the Washburn and Moen Manufacturing Company. Not only is there a failure of convincing affirmative evidence on the part of the complainant, but the long period during which the settlement was allowed to stand is, of itself, almost enough to estop the complainant. The effort made to explain and extenuate such delay does not help the complainant's case. It is said that complainant was constrained to execute the release and rest under it, because it feared that litigation to recover its demands would imperil its receipt of future royalties under the contract. Courts of equity, it has often been said, will not assist one who has slept upon his rights, and shows no excuse for his laches in asserting them. The complainant's excuse, in this instance, that it preferred for prudential reasons to receive money and an acquittance of claims from the Washburn and Moen Company, and to abide by the settlement for a period of several years, rather than to assert its existing demands, is entitled to a less favorable consideration by a court of equity than if its conduct had been that of mere inaction. *Lane & Bodley Co.* v. *Locke,* 150 U. S. 193, 201; *Hager* v. *Thomson,* 1 Black, 80.

Besides the claims covered by the settlement of July 27,

1881, there were certain other demands made by the complainant which shall now receive our attention.

It appears that on June 12, 1883, the parties entered into a supplementary agreement, whereby the royalty which the Washburn and Moen Company was to pay to complainant on barbed wire made by itself or its licensees was reduced from fifteen cents to five cents per hundred pounds from June 1, 1883, to February 12, 1885 ; and it is now claimed that complainant did not pay for royalties payable by its licensees at the rate of fifteen but at the rate of five cents per hundred pounds for the month of May, 1883, and that hence the Washburn and Moen Company owes complainant for barbed wire made by the licensees of the former during said month the difference between five and fifteen cents per hundred pounds. As against this claim, the Washburn and Moen Company point to a clause of said agreement which provides that said company " shall not be under obligation to pay said royalty on the barbed wire manufactured and sold by its licensees until after it shall have collected the same from its said licensees," and gave evidence tending to show that they only collected from their licensees, for the complainant, royalties at the rate of five cents per hundred pounds for the month of May, 1883. It is plausibly contended on behalf of the complainant that the clause cited did not relieve the Washburn and Moen Company from accounting for the higher rate of license until and after June 1, 1883, and if, indeed, the Washburn and Moen Company had actually received from its licensees royalties at the rate of fifteen cents per hundred pounds for the month of May, 1883, it would apparently be accountable therefor. As, however, that company only received royalties for said month for the complainant at the rate of five per cent and so reported to the complainant, which receipted for the royalties so collected, and as the matter stood unchallenged for so long a period, we think no injustice is done by leaving the settlement undisturbed. It is permissible to infer from the conduct of the complainant that it acquiesced in the construction put by the Washburn and Moen Company on the clause in question, as exonerating them from liability

for license fees which were not actually paid to and received by it for the month of May, 1883.

The fourth, fifth, and seventh assignments claim error in the failure of the court below to decree that complainant was entitled to recover from the Washburn and Moen Company royalty upon barbed fencing made and sold by divers licensees of said company prior to February 12, 1885, the royalty accruing on which was abated, released, or compromised by the said company. To dispose of these errors we must turn our attention to a settlement or agreement made by the Washburn and Moen Company with one Jacob Haish.

Haish was the owner of certain patents relating to barb wire and barb wire machinery. Litigation had arisen between him and the Washburn and Moen Company, as the owner of the Kelly and other patents, on questions of infringement. Ultimately the Washburn and Moen Company deemed a settlement with Haish to be for the benefit of all concerned, and hence, on July 26, 1881, such settlement was effected, whereby the Washburn and Moen Company and Ellwood purchased from Haish his patents, and he took a license from them authorizing him to manufacture ten thousand tons of barb wire per annum. As a condition of this settlement the Thorn Wire Hedge Company executed a collateral agreement, authorizing the Washburn and Moen Company to make said settlement with Haish, and releasing said company from all obligation under its agreements with the Thorn Wire Hedge Company "to account for any proportion of the moneys received from the said Jacob Haish whether in settlement of past infringements or for royalties hereafter paid under the said license, which may be required to be expended or remitted in the settlement with said Jacob Haish, or in payment of the consideration money for the transfer and conveyance of all the patents, rights to letters patent, and inventions, which are or shall be conveyed by the said Haish to the said Washburn and Moen Manufacturing Company and Isaac J. Ellwood, as provided in said proposed agreement."

Subsequently, certain other licensees of the Washburn and Moen Company refused to pay their royalties because of the

settlement made by that company with Haish.   They claimed that the agreement with Haish in effect gave him a free license for four thousand tons annually, and a license at fifty cents per hundred pounds for four thousand tons more.   Owing to this contention, the Washburn and Moen Company was disabled from collecting royalty from some of their licensees until new arrangements were made with them, and the claims of the Thorn Wire Hedge Company we are now considering are for its proportion of the royalties made uncollectible or released by the Haish settlement.   The complainant construes the release which it had given to the Washburn and Moen Company as extending only to the royalty accruing to it on Haish's own manufacture, and not to the royalty upon wire manufactured and sold by any other licensee, and as not releasing the Washburn and Moen Company from its duty to "use due diligence and lawful means" to collect such royalties.

That the settlement with Haish was made with the full knowledge and approval, as to substance and terms, of the Thorn Wire Hedge Company cannot be denied.   That such settlement would operate to release any other licensees, in whose royalties both the Washburn and Moen Company and the Thorn Wire Hedge Company had interests was probably not foreseen by either party.   When it was subsequently determined by the Supreme Court of Illinois, in the case of *Washburn and Moen Manufacturing Company* v. *Chicago Galvanized Wire Fence Co.*, 109 Illinois 71, 119 Illinois 30, that the other non-assenting licensees of the latter company had a right to object to those terms of the settlement with Haish which, to some extent, relieved him from license fees, and it hence became necessary for the Washburn and Moen Company to make new terms with such licensees, we think it by no means follows that the Washburn and Moen Company became liable to the Thorn Wire Hedge Company to make good the loss thereby occasioned.   On the contrary, such a result of the settlement with Haish must be deemed to have been an incident thereof, and to have been, in a legal sense, within the contemplation of the Thorn Wire Hedge Company.

Nor do we find any satisfactory evidence that, in the litigation, or in the settlements made with the other licensees, the Washburn and Moen Company were guilty of negligence, passive or active, which would create any liability on its part to the complainant company. To occasionally take promissory notes from licensees in lieu of cash for accrued royalties would, if done in good faith, not be so far out of the course of ordinary business transactions as to render the Washburn and Moen Company liable for losses occurring through the insolvency of any of the licensees. The contract was to pay quarterly to the Thorn Wire Hedge Company its share of royalties that had been collected and received by the Washburn and Moen Company, obviously showing that the parties contemplated that the royalties would not necessarily be paid as they accrued.

Upon this part of the case our conclusion is, that the contracts between these parties did not import that the Washburn and Moen Company should guarantee the payment by the licensees of the royalties, but should exercise reasonable diligence in their collection; and that the evidence does not disclose any such want of diligence or of good faith as to create the liability asserted in the bill.

The tenth assignment avers error in the court below in not decreeing that appellant was entitled to have and recover of and from the appellee royalty upon the barbed fencing manufactured and sold by defendant under the designation of Brinkerhoff Barbed Fencing.

The allegation of the bill touching this ground of complaint was as follows: "There was manufactured and dealt in by the defendant a certain patented barbed wire, known as the 'Brinkerhoff Patent;' that the form or construction of such wire was slightly different from the barbed wire made under the Kelly patent, heretofore mentioned, but orator claims that the same was and is *barbed wire* within the meaning of said contracts."

In respect to this the defendant in its answer stated: "It admits that there was manufactured and sold by it a certain patented article known as the 'Brinkerhoff Fencing,' but says

that the form and construction of such fencing was widely different from the barbed wire made under the Kelly patent heretofore mentioned, and says that the same was not and is not *barbed wire* within the meaning of said contracts."

The evidence discloses that the Washburn and Moen company manufactured and sold, prior to February 19, 1885, upwards of 4000 tons of Brinkerhoff barb wire, upon which it paid no royalty to appellant. The contract provided that the Washburn and Moen Company should enter upon the manufacture of barbed fence wire under the Kelly patents aforesaid, and use reasonable and diligent efforts to supply the demand for this article throughout the country, and also should use proper and reasonable diligence in prosecuting infringers of the several letters patent as aforesaid, or any of them, to the end that said patents might be fully enforced and sustained.

If the issue thus raised under the pleadings presented the question whether the Washburn and Moen Company should account for royalty received by it from the sale of Brinkerhoff barb fencing, because such fencing was an infringement of the Kelly patents, and thus within the terms of the contract, it would be necessary for us to investigate the state of the art at the time the patents were granted, as well as to compare the several claims of the respective patents, and our inspection of this record has not disclosed to us the materials necessary to enable us to do this intelligently.

We do not, however, perceive that such an issue or question was raised by the pleadings or was intended by the parties. That the complainant did not intend to raise an issue under the patent laws of the United States is seen in the fact that it filed its bill of complaint in a state court. Nor did the defendant, in its petition for removal, place the right to remove upon any allegation that the subject matter of the suit belonged exclusively to the Federal court, but upon the diverse citizenship of the parties. But any doubt upon this subject is removed by the admission of the appellant's counsel, who, in his careful brief, says : " The question of infringement upon the Kelly letters patent is not raised by the pleadings in this case. The bill is not drawn in the form of, nor does it contain,

the usual allegations requisite to a bill for infringement of letters patent. The answer does not aver that the Brinkerhoff patent does not infringe the Kelly patents, or any of them. This issue is not presented."

The learned counsel then proceeds to state and discuss the question as he claims it to be, and that is, that the terms of the contract import a covenant, on the part of the Washburn and Moen Company, not to manufacture and sell barb wire under any other letters patent than the Kelly patents, and to use reasonable diligence to supply the demand for the article made under the Kelly patents, and not made under patents in competition with them.

Our reading of the contract between the parties fails to reveal any express covenant to the effect claimed, nor do we perceive that such a covenant can be fairly implied from the language used, even when read in the light of all the facts and circumstances.

The provision of the contract is that the Washburn and Moen Company shall pay royalty on all barb fence wire which shall be made and sold " under said several letters patent or any of them." The letters patent referred to are expressly mentioned, and do not include the Brinkerhoff patent, which indeed was subsequently granted. Nor does the history of the case show any reason for the contention that the Washburn and Moen Company was disabled, by the contract, from buying the Brinkerhoff patent, and making wire under it. If that company had not purchased the Brinkerhoff patent, the owner could have made and sold wire outside of the Kelly patents, and such competition would plainly have been more largely detrimental to the common interests of the parties to this controversy than that which arose under the purchase as made.

It is true that, in 1881, the Thorn Wire Hedge Company claimed that the Brinkerhoff wire strip was covered by the agreement, and demanded an account of royalty thereon. But this claim was then rejected by the Washburn and Moen Company, which, while admitting that no sales under the Brinkerhoff patent had been reported, asserted that it was in no sense subject to the Kelly patents.

No further claim in this behalf was made by the appellant for five years, during which period reports were duly made by the Washburn and Moen Company, without including any statement of sales made by it of wire made under the Brinkerhoff patent, and monthly settlements were made and differences adjusted. So long a period of acquiescence discredits any renewal of the demand.

In the absence, then, of any express covenant, and in view of the long course of dealing between the parties, in which this claim sank out of sight, we think the complainant's claim for an account of royalty for wire made under the Brinkerhoff patent cannot be sustained. We therefore find no error in the decree of the court below dismissing the original and amended bill of complaint.

This brings us to a consideration of the cross-appeal of the Washburn and Moen Manufacturing Company, wherein complaint is made of the court below in dismissing the defendant's cross-bill.

The Washburn and Moen Company seeks by its cross-bill to recover from the Thorn Wire Hedge Company its alleged proportion of moneys which the Washburn and Moen Company had been compelled to refund to certain licensees by reason of its purchase of the Haish patents. But the Thorn Wire Hedge Company was not a party to the purchase. True, as we have seen, it assented to the purchase and released the Washburn and Moen Company from any obligation arising out of it, but we are unable to see that the relation between the parties justifies the demand that the Thorn Wire Hedge Company should return any part of the moneys theretofore or thereafter paid to it. The payments to it were of moneys due to it, and which it had a right to receive. The subsequent disclosure that by its settlement with Haish the Washburn and Moen Company became responsible to its own licensees for damages arising out of the transaction with Haish did not, in our judgment, operate to affect the payments previously made to the Thorn Wire Hedge Company. Besides, the record discloses that the latter company continued to pay over royalty, month by month, to the Thorn Wire Hedge Company after

the date of the filing of the bill by the Chicago Galvanized
Wire Fence Company, in September, 1881, down to the time
of filing the cross-bill in July, 1889, without abating or
diminishing such payments by setting off the moneys now
demanded. Moreover, the moneys now sought to be recov-
ered in this cross-bill were for royalties accruing to the Thorn
Wire Hedge Company prior to the amendment or supplement
of June 12, 1883, and no claim or suggestion was then made
on account of the demands of the other licensees, although the
adverse decision in favor of the Chicago Galvanized Wire Com-
pany had been rendered eight months before. These payments
were, therefore, voluntarily made with full knowledge of the
facts.

Without pursuing the subject further, our conclusion is that
the court below committed no error in dismissing as well the
cross-bill as the original and amended bill, and its decree is
accordingly

*Affirmed : the costs in this court to be paid by the appellant
in each case.*