### HALL v. FRANK et al.

(District Court, E. D. New York. April 18, 1912.)

1. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—BEDSTEAD FASTENING.

The Hall and Tilley patent, No. 625,164, for a bedstead fastening, for securing the spring section of a metal bedstead, in which the side bars are rigidly connected by means of the spring frame to the end pieces or post sections, discloses patentable invention, but, in view of the prior art, must be narrowly construed and limited to the exact combination shown. As so limited, *held* not infringed by the device of the Frank patent, No. 650,311.

2. PATENTS (§ 289*)—SUIT FOR INFRINGEMENT—LACHES.

A delay of nine years by the owner of a patent, after having knowledge of the manufacture and sale of a claimed infringing article, before bringing suit, constitutes such laches as will defeat the suit, unless excused; and it is not a sufficient excuse that complainant was prevented from sooner bringing the suit by his partner in the ownership of the patent.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 467–469; Dec. Dig. § 289.*

Laches as a defense in suits for infringement of patent, see notes to Taylor v. Sawyer Spindle Co., 22 C. C. A. 211; Richardson v. D. M. Osborne & Co., 36 C. C. A. 613.]

In Equity. Suit by Frank A. Hall against David Frank and John Trounstine, doing business as the Greenpoint Metallic Bed Company. On final hearing. Decree for defendants.

Burnham C. Stickney (Isaac B. Owens, of counsel), for complainant. Charles C. Gill, for defendants.

CHATFIELD, District Judge. The complainant manufactures, under patent No. 625,164, issued May 16, 1899, to Hall and Tilley, a large number of metallic bedsteads, in the structure of which two side bars are rigidly connected by means of the frame of the wire springs. These bedsteads, therefore, are in three pieces—that is, a head piece, a foot piece, and the portion carrying the springs—as distinguished from a five-piece bedstead, having a head piece, a foot

piece, two side bars, and a detachable spring frame. It is apparent at once that the means of connection between the spring section and the two posts of each end piece will not need a block or fastening against lateral motion, as this is, in all instances, secured by having the two sides of the spring frame engage in the opposite direction from each other. This principle runs through the alleged infringing devices, and was well recognized in the type of bed for which the patent above mentioned was designed.

The earlier patents show a long series of devices, which can be described generally by saying that the side piece or attachment thereto is made to insert into a dovetailed or recessed portion of the post, and is necessarily incapable of movement sideways, while being held firmly in place as against further downward movement, after reaching a horizontal position at right angles to the post, by some leverage equivalent to a three (or more) point bearing, effected by the shape of the parts or an independent wedge.

The state of the prior art is such that any particular patent relating to such a fastening for a bed with separate side pieces would necessarily be extremely narrow in scope and limited to the precise form, or its equivalent, in any detail of the various elements shown by the claims as allowed by the Patent Office. Most of the prior patents relate to wooden bedsteads, and the needs of a fastening for metallic beds, or those in which the sides are rigidly joined, might require invention, or might apply the ideas of these earlier patents, discarding such as could be used only in wooden beds.

A recital of these patents will not be attempted, inasmuch as they so clearly show the assumption by the various inventors of the principles involved in obtaining rigidity and also in securing the anchorage or tight joint desired, by means of the principle of a lever and the assistance of a wedge.

But with the increased use of metallic bedsteads, during the years between 1890 and 1899, it is apparent that a three-piece bedstead, as shown in the Hoskins patent, No. 513,685, of January 30, 1894, was well understood. This patent shows the idea of making the joint tight and the structure rigid by a wedge-shaped slot socket, into which the dovetailed projection fits at each of the posts. It is the first patent cited having a rigid frame for the springs, necessitating a comparatively easy and accurate contact, in order to permit the bedstead to be readily taken apart or set up without the exertion of considerable force, or the assistance of more than one person.

Similarly, the Brand patent, No. 570,369, of October 27, 1896, the Merritt patent, No. 581,485, April 27, 1897, and the Edsall patent, No. 358,151, of February 22, 1887 (which was even earlier than the Hoskins patent), show the application of the rigid bearing surface, the wedgelike tightening method, and the general idea of simplifying the contact which was distinctly advanced by the patent in suit. Similarly, also, an improved idea of simplified contact is shown in the Frank patent, No. 650,311, of May 22, 1900, owned by the defendants and under which their beds have been made.

The Hall and Tilley patent of the complainant and the Frank patent of the defendants are alike, in that they use pins, coming to rest horizontally in slots in a vertical plate attached to the post of the bed, and in that they make the binding surface (which, as to the strains caused by the side pieces, is equivalent to the fulcrum of the lever) by an additional sliding or diagonal contact between some portion of this plate upon the bedpost and the end of the side from which the pins just described project.

It appears from the record that both styles of bedstead fastening are practical and successful commercially, and both the complainant and the defendants have evidently had large sales. A third manufacturer, W. F. Bernstein, whose patent, No. 28,476, was issued April 12, 1898, uses, for a three-piece bedstead, an even more simple arrangement of pins falling into slots in the plate attached to the bedpost, and dispenses with the additional contact which has been referred to above as the fulcrum. In the Bernstein patent the shape of the slots and the friction, or binding force, afforded by reasonably close adjustment of the parts, makes it possible to form a sufficiently compact and stable joint; but it is evident that there is more freedom of motion and greater possibilities of gradual wear than in the designs of the defendants and complainant. But the desired objects of ease in putting together and taking apart the bed, and in being free from binding contacts, which can only be separated with a hammer or external force, are shown to a greater extent in the Bernstein patent · than in either that of the complainant or defendants.

It is easy to see, therefore, the precise scope of the patents with which we have to do, while they substantially meet the same requirements and produce very similar results. The defendants' patent, both in its specifications and in its practical application, contains the possibility of use for a five-piece or separate-sided bedstead, in that the third or binding surface of the fastening is rendered incapable of lateral movement, by constructing this surface at a slight angle to the line of the side of the bed. In other words, when the Frank fastening falls into place, it is locked and prevented from moving down, forward or back, or sideways, while in the Hall and Tilley patent, the sideways movement is prevented only by rigid connection between the two sides, thus compelling the spring and sides to be firmly joined in the one structure.

[1] This statement of the details of the patents brings us directly to the issues in the case. The defendants allege invalidity of the complainant's patent, on the ground that none of the ideas contained therein were undisclosed in the earlier patents which have been already referred to. But it would seem that claim 4, with which we have to do, and which is worded as follows:

"A bedstead fastening, comprising a post section, and a rail section, the post section being provided with a hook at each end and with a wedgelike surface intermediate of the hooks, the said wedgelike surface being inclined from its upper to its lower end in a direction away from the post, and the other section provided with pins for engaging the hooks, and with an abut-

ment intermediate of the pins for engaging the cam surface, substantially as described"

—was correctly interpreted by the Patent Office, and that invention was shown in so assembling the well-known parts of the earlier patents as to furnish a practical and simple fastening, which in metallic bedsteads would supply all of the advantages and furnish all of the rigidity secured to single joints in wooden bedsteads, with dovetailed slots and wedge-shaped surfaces, and yet would allow the metallic bedstead, even when constructed with the two sides in one frame, to be more easily and quickly set up or taken down.

We can therefore dismiss this defense of invalidity and take up the question of infringement. The primary difference between the complainant's device and that of the defendants is in the method of applying the third or bearing surface, by which the principle of a wedge is applied to the contact of the two pins with the slots into which they pass.

In the complainant's device a third pin, projecting from the side of the bed, rests against the sloping surface of the plate projecting out from the post, so that, as the two pins first described reach the bottom of the slots in which they are to rest, they are tightly pressed against the curve on that side of the slot away from the post, through the wedging action of the third pin, which, by the same movement of the side, has been carried further down upon the outside edge of the plate, sloping at this point away from the post. The patentee has limited his claim so as to require this sloping surface (upon which the third pin shall rest when in close contact) to come between the levels of the upper and lower pins first described.

It is evident that in a rigid structure this diagonal bearing surface could have been above or below, instead of between, these pins; but the inventor conceived that the simplest construction, and the one which would furnish the least likelihood of binding or of causing difficulties in setting up and taking down, was the one in which but three points of contact (that is, the simplest form of stable position) should be included, and that of such three-point contacts the simplest and most easily operated would be that in which the third point was between the other two.

In the defendants' patent, the desire to provide a joint which could not be taken apart sideways, and which could be used to firmly fasten one side of the bed, even if not connected with the frame of the springs, necessitated a reversal of the position of the third or bearing surface, by putting the sloping part of the plate nearer the post, i. e., between the pins (which were to enter the slots) and the post; that is, by having the third pin or point of contact, of the Hall and Tilley patent, wedge against the inclined edge, in such a way as to draw the pins in the slots toward that inclined edge, rather than to force them away therefrom. This enabled the inventor in the Frank patent to make use of the angle at which that sloping face is set (with reference to the vertical plane of the side of the bed) so as to make a joint which cannot be opened sideways when the fastening

is in place. But, by so doing, some portion of this bearing surface may come between the pins which rest in the slots of the fastening, and in that respect the device of the Frank patent, so far as one point or position of the surfaces is concerned, seems to correspond to the language of claim 4 of the Hall and Tilley patent.

In practice the defendants make this diagonal bearing surface in two parts; that is, a recess is cut out in the middle portion of this surface, between the two pins, and the fastening has actually four places of contact, of which two are formed by the pins, and two by the flat end surfaces of the side piece of the bed.

In the device presented as an illustrative exhibit upon the argument, one of these surfaces, at the end of the side, protrudes at its upper corner enough to come in contact with the sloping face of the plate upon the post, at a point between the levels of the two pins. And it is pointed out by the complainant that this entirely meets the requirements of the language of claim 4, there thus being a post section, a rail section, a hook at each end of the post section, and wedgelike surface intermediate of the hooks, inclined in a direction away from the post, with pins upon the rail section, and with an abutment (i. e., the projecting corner of the end piece) intermediate of the pins for engaging the diagonal surface of the post.

It is evident that, in so far as this accidental construction is concerned, the different elements are present called for by the language above recited. But, in order to avoid such accidental or possible apparent infringement, the defendants have lengthened the recess or cut-out portion of the end of the side, until the abutments—that is, the bearing surfaces of the side—are entirely above or below, respectively, the pins, and in this way avoid the accusation that their abutment is intermediate of the pins.

Even without this change, it could not be held that an accidental happening, such as an inaccuracy in casting, or the projection of a small painted surface upon one device, could be held to prove infringement throughout the general use of the patent in some examples of which that accidental happening occurred. But an examination of the various models makes it apparent that, in substantially all of the earlier devices made according to the drawings and specifications of the Frank patent, some portion of the bearing surface would come in contact with the diagonal edge of the post, at a point between the pins, unless, as is now the case, the recess be so lengthened as to carry this bearing point either above or below these pins. And hence we have to consider whether or not the device, as in use at the time of bringing the action, infringed the Hall and Tilley patent, from the standpoint of its ordinary application, and not simply from the standpoint of the accidental protuberance or worn point of contact in the sample submitted.

The Hall and Tilley patent describes a fastening, in which, as has been said, the abutment is placed intermediate of the pins, for the purpose of furnishing the simplest three-point or three-legged contact. It states in the claim that the "cam surface" is engaged "sub-

stantially as described." It is plain that the purpose of the fastening is to enable the easiest possible release, and it is apparent that the inventor had in mind the forcing of the parts by the use of the wedge-shaped surface *away from* a binding or too tight contact, while, on the contrary, the necessary object and result of the methods of the Frank patent is to force together the bearing surfaces.

The earlier patents and the condition of the art was such that no valid patent could be obtained for the idea of a three-point contact, as secured by a wedge-shaped slot in the plate; neither could Hall and Tilley patent the idea of the solid frame. Hence their patent must be so narrowly construed, in order to make it valid, as to limit it to a combination of known parts, so arranged as to serve the exact purpose which they had in mind, and exactly in the form which they described. The doctrine of equivalents could apply to this patent only in the sense that an equivalent for any particular element can be substituted, which will take the exact place of the particular element, and which will carry out the purposes of that element in the same identical way.

Hall and Tilley did not acquire the right to patent every application of the wedge idea to a three-piece metallic bed fastening, nor did they acquire the right to patent the use of a wedge in connection with pins, in such a broad way that any particular portion of the defendants' structure could be separated from the other portions, and, when so separated, treated as an equivalent for the narrow application of the various parts in the combination patented by them.

As has been pointed out by the experts and upon the argument, Hall and Tilley applied a three-legged or three-point support in a particular way, and with the intent to accomplish particular objects. Frank applies what is equivalent to a four-point support in a somewhat different way and with a different object, with the idea, also, of accomplishing an additional purpose. The Frank patent seems to contain an invention which was properly recognized by the Patent Office as an original change from the combination of the Hall and Tilley patent.

The language of claim 4 of the Hall and Tilley patent must be construed to mean what it says; but it cannot be so separated from the prior art, from the specifications, and from the drawings, as to be treated as a pioneer patent solely because the language is capable of being understood as a description of a broad pioneer invention, as well as of a mere combination, in advance of previous combinations intended for the same purpose. If the Hall and Tilley claim had to be construed in its broad general language as an attempt to patent the idea of this kind of fastening, it would be plainly invalid.

But it has been frequently held that where the language of a claim is plain in its meaning, when read in connection with the subject-matter of which it is talking, and when so read describes a valid, patentable combination, it should not be interpreted by the courts according to other possible meanings of the terms used, by which not only would the claim be rendered invalid, but by which other pat-

entable combinations would be made apparent infringements, and would then in turn have to be relieved from the consequences of such infringement by a return to the conclusion that the construction of the claim rendered it invalid.

[2] A third defense has been introduced, based upon the alleged laches of the complainant, whose patent had already run some nine years after he had knowledge of the defendants' patent and of his device as placed upon the market. Some attempt was made to show that the complainant had warned the defendants and that he (the complainant) had been prevented from bringing suit by the actions of a part owner or partner in his patent.

This defense of laches would seem to be of itself sufficient, as no valid excuse has been presented by the complainant to justify his delay from 1900 to 1909 before bringing action. The statement that his partner was unwilling to bring suit, and that he did not succeed in buying out this partner until just before the action was started, may be an exact statement of what occurred; but the court could not allow the patentee to sleep on his rights for nine years, in the face of a large commercial use of the alleged infringement, in a case where considerable doubt appears both as to the validity of the patent and as to the fact of infringement, and then accept, as an excuse for this delay, the statement that one of the owners of the patent had been ready to acquiesce in the alleged infringing use during the entire period, and that the other, who finally brings suit, had not been able to buy him out. This may be the actual reason why suit was not brought earlier, but it does not remove the responsibilities for not bringing the suit, if any have been incurred.

Inasmuch, however, as the court has not been able to find infringement, the defense of laches is but an additional reason for the result reached, and that is that the defendants are entitled to a decree.