CLOSZ & HOWARD MFG. CO. v. J. I. CASE THRESHING MACH. CO.

(District Court, D. Minnesota, Fourth Division. February 19, 1913.)

1. PATENTS (§ 46*)—PATENTABILITY—UTILITY OF DEVICE.
A device, to be patentable, must be useful, as well as new.
[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 54, 55; Dec. Dig. § 46.*]

2. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—SIEVE.
The Martien patent, No. 734,467, for a sieve, claims 1, 2, and 6, *held* void for lack of novelty, and claims 3, 4, and 5 valid and infringed.

3. PATENTS (§ 289*)—SUIT FOR INFRINGEMENT—EFFECT OF LACHES.
The owner of a patent, which failed to mark the articles made thereunder, and, with knowledge of its infringement by defendant, gave no notice of the fact for six years, which was the first that defendant knew of the patent, and afterward delayed bringing suit and the taking of testimony, *held* not entitled to an accounting for damages or profits, but not barred by such laches from the right to an injunction.
[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 467–469; Dec. Dig. § 289.*]

4. PATENTS (§ 325*)—SUIT FOR INFRINGEMENT—COSTS.
Where the complainant in an infringement suit prevails on some of the claims of the patent sued on, and defendant on others, the costs should be apportioned.
[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 607–612; Dec. Dig. § 325.*]

In Equity. Suit by the Closz & Howard Manufacturing Company against the J. I. Case Threshing Machine Company. On final hearing. Decree for complainant.

Williamson & Merchant, of Minneapolis, Minn., for plaintiff.
Pierce, Fisher & Clapp, of Chicago, Ill., and Clapp & Macartney, of St. Paul, Minn., for defendant.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

WILLARD, District Judge. As indicated at the hearing, I hold now that claims 1, 2, and 6 show no patentable novelty.

[1] Claim 4 has raised portions on the concave or operating surface of the corrugated slats. This feature is a new one. It is true that the indentations on the under or convex surface, which Martien used for strengthening the fastenings of the rods to the slats, also make ridges on the upper or concave side; but claim 4 does not connect the ridges or raised portions in any way with the fastening of the rod to the slat. If Martien had fastened the rod in the same way that Hixson did, and had shown in his specification and drawings these raised portions, I think that claim 4 would have disclosed something that would amount to invention, provided that the improvement was a useful one, for it must be useful, as well as new. Colorado Tent & Awning Co. v. Parks; 195 Fed. 275, 115 C. C. A. 245 (8th Circuit).

The great utility now claimed for this improvement was evidently not apparent to the plaintiff when it bought the patent and property of the Ashland Sieve Company in 1903, judging from the price which it paid and the terms of the contract. Nor does it seem to have been apparent to it for many years after that, considering that it never marked its sieves which contained this improvement with the date of the Martien patent until 1910. A great deal of evidence has been taken upon this subject, and, after considering it, I am not able to say that the prima facie presumption of utility created by the granting of the patent has been overcome.

[2] Claim 3 is practically the same as claim 4, and the defendant classifies claim 5 with claims 3 and 4. I therefore hold that claims 3, 4, and 5 are valid. That they have been infringed by the defendant since 1901 is admitted.

[3] It is claimed, however, by the defendant, that the plaintiff, by reason of its failure to comply with the provisions of section 4900 of the Revised Statutes (U. S. Comp. St. 1901, p. 3388), is not entitled to recover damages or profits, and by reason of its laches is not entitled even to an injunction.

Section 4900 required the plaintiff to mark its sieves with the date of the patent. It appears that when the plaintiff bought the property of the Ashland Sieve Company it received from that company 110 sieves in all. Part of these, however, were of the Hixson type, and Closz, the president and general manager of the plaintiff, was unable to say how many were of the Martien type. He says that he re-marked the sieves with the date of the Martien patent, and as near as he can recollect sold between 30 and 40. Between 1904 and 1910 all of the sieves sold by the plaintiff contained the Martien ridges. The plaintiff sold during that time, not including those sold in 1910, 21,708 sieves. It marked upon a plate attached to those sieves the dates of three other patents, but it did not commence to mark its sieves with the date of the Martien patent until after this suit was commenced, and about two months before Closz gave his testimony. It cannot be said that plaintiff has complied with section 4900 when it has sold 21,738 sieves, and of these has marked 30, and failed to mark 21,708. Matthews & Willard Mnf'g Co. v. National Brass & Iron Works (C. C.) 71 Fed. 518.

The plaintiff claims, however, that it complied with the last part of section 4900 by giving the defendant actual notice of its infringement. This notice was given, if at all, in a conversation between Closz and Bull, the president of the defendant. Passing the question as to whether the conversation, even as claimed by Closz, would be sufficient as a notice of infringement under this section, I am satisfied that the burden of proof resting upon the plaintiff has not been met. Bull says that no notice was given him at all by Closz of the fact that the plaintiff owned the property of the Ashland Sieve Company. It is said in the brief, and was stated on the oral argument, that Closz went to Racine in 1903, and had this conversation with Bull, for the express purpose of giving to him the notice required by section 4900. It seems quite extraordinary that a person who knew as Closz evidently did know, the requirements of this statute, should have contented himself with an informal oral conversation. He would naturally have given notice in writing, if his purpose was as it is now claimed to be. His own testimony, however, shows that that was not his purpose in going to Racine. His only purpose was to ascertain if defendant had a license or shop right from the Ashland Sieve Company. He learned that it had one from Hixson, but with that he was not concerned.

It is claimed, however, by the plaintiff, that the defendant as early as the spring of 1901 commenced to deliberately pirate the Martien invention. If it did this, it must have known of the Martien invention. I have examined all the evidence in the case relating to this subject, and I cannot find any proof to show that the defendant knew anything about the Martien application or patent until it was given notice thereof on April 28, 1909. Bull, the president of the defendant, says (page 2) that he never heard of it until the commencement of this suit. Robinson, the vice president, says (page 14) that the first information the company had was the receipt of a letter from Mr. Williamson, which was on April 28, 1909. Norton, the general manager, says (page 162) that he never knew of the Martien patent before the letter from Mr. Williamson. Russell, who was assistant sales manager in 1900, went to Ashland in the fall of 1900. He then had a conversation with Mykrantz. Mykrantz says that Russell's sole business with him was to make a new contract for the next year for the purchase of the Hixson sieves.

There is no doubt but that all the sieves bought by the defendant from the Ashland people were of the Martien type. It would seem that there was no occasion for Mykrantz to give Russell any notice with reference to the Martien application. He says that Mr. Karth did most of the talking. It is true that Mykrantz testified (page 515) that Russell was told that the Martien patent was pending, but this was in answer to a leading question from the plaintiff's counsel. In any event, there is no evidence that Russell communicated this information to Norton, or to any one else connected with the company. This casual conversation cannot be considered as sufficient evidence of knowledge on the part of the defendant company of the Martien application, so as to convict it of deliberate piracy. Hixson could not remember whether or not he told Russell of the Martien application. The only interview

which he had with Russell was when Hixson still had an interest in the business, and Hixson says that Russell's business at Ashland at that time was to find out about the purchase of a shop right. Hixson said (page 414) that he did not tell Norton of the Martien application. His subsequent statement on page 427 that he possibly did tell Norton about it cannot overcome his previous statement and the statement of Norton that he heard nothing about the Martien application. There is nothing, therefore, in the oral evidence to show any knowledge on the part of the defendant company of Martien's rights prior to April 28, 1909.

Nor is there anything in the documentary evidence to show this. The correspondence which preceded the license contract of April 25, 1901, does not mention the Martien application. The license contract itself does not mention it. The chief object of this license contract was to give to the defendant a shop right on Hixson's improvements, which were set forth in Hixson's application No. 44,043. The number of this application and the date of its filing are given in the contract. This application described the new style of sieve which the defendant said in its letter of April 9, 1901, that it wanted. The last paragraph of the license contract is as follows:

"Said shop right shall include all further improvements made by said Hixson subsequent to the above applications covering improvements in adjustable sieves, as well as incompleted applications made on same by said Hixson subsequent to and including United States letters patent No. 624,333, now claimed to be owned by the Ashland Adjustable Sieve Company."

The plaintiff places great reliance upon this paragraph, as showing notice to the defendant of the adverse claim of the Ashland Company. The words "now claimed to be owned by the Ashland Adjustable Sieve Company" must refer either to patent No. 624,333, or to future improvements to be made by Hixson, or to incompleted applications made by Hixson. It is not necessary to inquire as to which one of these it does refer, for no one of them would cover the Hixson application, No. 44,043. It seems clear, however, that it refers to patent 624,333. This construction coincides with McCray's letter, which clearly indicates that what Hixson claimed to have been defrauded out of was "the old corrugated sieve."

The situation of the defendant, then, was this: In April, 1901, it bought from Hixson the right to manufacture sieves described in his application No. 44,043. The sieve therein described is, as both parties agree, identical with the Martien sieve. At the time it acquired this right it had no knowledge or notice that Hixson was not the inventor of the improvement, or that Martien had made an application for a patent for the invention, or that a patent was ever issued. It commenced the manufacture of sieves of this type in 1901, and it continued it until April 28, 1909, in the same belief as to Hixson's rights, and in the same ignorance as to Martien's rights.

It becomes important, now, to inquire as to what knowledge the plaintiff has of this infringement, and what action it took with reference thereto. Closz testified that at the time his company in 1903 bought the property of the Ashland Sieve Company, which included the Martien patent, he knew that the defendant was making that kind of a sieve, and that he knew as early as 1901 that it was doing so. Closz

also testified that the defendant had a warehouse in the town where he (Closz) lived, and that he was in that warehouse very frequently throughout all these years. He also testified that Robinson, the vice president, told him at the Minnesota Fair in 1902 that the defendant had made 11,000 sieves that year. Closz said that in the winter of 1908, or in January, 1909, he went to Racine to see Robinson, was taken all through the shops, and was told by the superintendent of the defendant that the company was making about 5,000 sieves each year. Yet during all this time he never objected to the manufacture of the sieves by the defendant, never told them that they were infringing a patent which his company owned, and, as has been seen, it never indicated upon the sieves which it was selling that they were manufactured under the Martien patent. The excuses that Closz gives for this inaction are too inadequate to be noticed.

It is very evident that one of two things is true: The plaintiff either thought that the Martien improvement was of no value, and its failure to mark the sieves with the date of the patent would indicate this, or there was a deliberate purpose on the part of the plaintiff to allow the defendant to continue the manufacture of these sieves in great quantities in ignorance of the plaintiff's claim, and then, after a large amount of damages and profits had accumulated, to bring suit therefor. The statement of Closz, as an excuse for his delay, that he knew that the Case Company was responsible, and the fact that when the plaintiff did give notice the six-year statute of limitations upon its claim for damages was within two months of expiring, would indicate the truth of the latter hypothesis. Under the circumstances of this case, the plaintiff is clearly not entitled to an accounting for profits or damages prior to April 28, 1909. Layton Pure Food Co. v. Church & Dwight Co., 182 Fed. 35, 104 C. C. A. 475, 32 L. R. A. (N. S.) 274. (8th Circuit).

Is plaintiff entitled to an accounting for profits since April 28, 1909? Suit was not commenced until October 11, 1909. Plaintiff did not commence to take its testimony until July 14, 1910. The plaintiff having remained quiet for six years with knowledge of defendant's infringement, it was not unreasonable for the defendant to believe that, notwithstanding the notice of suit and its commencement, the plaintiff did not really intend to press its claim. Prior to the time when testimony was taken, which was July 14, 1910, sieves for the summer seasons of 1909 and 1910 had probably been distributed. There is some evidence to indicate that the defendant changed the construction of its sieves for the season of 1911, and did not use one of the Martien type. However this may be, I do not think that under the circumstances of this case, the plaintiff is entitled to any accounting at all.

The defendant claims that the plaintiff is not entitled even to an injunction. This claim, however, under the authorities, cannot be sustained. Layton Pure Food Co. v. Church & Dwight Company, 182 Fed. 35, 104 C. C. A. 475, 32 L. R. A. (N. S.) 274. In several of the cases cited by the defendant the bill was dismissed on final hearing, where the question of laches was raised. In some of these cases, however, the patent had expired at the time of the final hearing. In one the validity of the patent and the question of infringement were not consid-

ered. In several the court held that there was no infringement. No case has been cited where the court at the final hearing held that the patent was valid, that it had been infringed, and then dismissed the bill on account of laches, where the patent had some years to run. The nearest approach to such a case is McLaughlin v. People's Railway Co., 21 Fed. 574, which was heard in the Circuit Court on a demurrer to the bill.

[4] Where the plaintiff prevails on some of the claims, and the defendant on others, the costs should be apportioned. J. L. Owens Co. v. Twin City Separator Co., 168 Fed. 259, 93 C. C. A. 561 (8th Circuit). In this case, the plaintiff having prevailed on three claims and the defendant on three, each party should pay its own costs. The result is that a decree should be entered, and it is so ordered, declaring:

1. That claims 1, 2, and 6 are void for want of patentable novelty.

2. That claims 3, 4, and 5 are valid, and that they have been infringed.

3. That the plaintiff is not entitled to any accounting.

4. That the plaintiff is entitled to a permanent injunction, as prayed for in the bill.

5. That neither party recover costs of the other.