GILLONS et al. v. SHELL CO. OF
CALIFORNIA. *

No. 7931.

Circuit Court of Appeals, Ninth Circuit.

Nov. 30, 1936.

*Rehearing denied Feb. 23, 1937.

John L. McNab, of San Francisco, Cal., Raymond Ives Blakeslee, of Los Angeles, Cal., and Walter Christie, of San Francisco, Cal. (S. C. Wright, of San Francisco, Cal., and Kelly L. Taulbee, of Los Angeles, Cal., of counsel), for appellants.

Chas. M. Fryer and Alfred C. Aurich, both of San Francisco, Cal., for appellee.

Before WILBUR, GARRECHT, and MATHEWS, Circuit Judges.

GARRECHT, Circuit Judge.

On February 27, 1930, the appellants filed a bill of complaint against the appellee, asking for an accounting because of the alleged infringement of United States letters patent No. 1,084,080, issued, by assignment, to the appellant Richfield Oil Company. By consent of the parties, the appellant Richfield Oil Company, which had originally appeared as one of the plaintiffs, was ordered by the lower court to be made a party defendant. The appeal has been brought to this court, however, with the title of the cause as it originally was set out in the court below.

The patent purports to deal with "new and useful Improvements in Oil-Refining Mechanism," one of the objects of which is "to provide an apparatus in which a device is employed capable of thoroughly breaking up and separating the oils to be refined, after they have been given a preliminary heating, the portions which are not driven off in vapor being returned and further heated."

The bill was amended several times. It alleges that, within the six years prior to the filing of the suit, the appellee, which owns and operates a petroleum refining plant at Martinez, Cal., has infringed and continues to infringe the patent in controversy.

The trial in the court below occupied about 21 days, during which time 27 witnesses gave oral testimony before the chancellor. The court found in favor of the appellee on the grounds of laches and noninfringement, and entered a final decree dismissing the bill. From that decree, the present appeal was taken.

Since the defense of laches alone, if established, is of itself determinative of this case, we will set forth briefly the facts bearing upon that point.

In 1919, eleven years before the instant suit was filed, the United States Department of the Interior published a bulletin entitled "Removal of the Lighter Hydrocarbons from Petroleum by Continuous Distillation, With Especial Reference to Plants in California." Of this publication, the appellant Gillons, who was the applicant for the patent in suit, made the following comment in an affidavit filed in the court below: "It clearly appears from a consideration of the said Government bulletin, with respect to the said Martinez plant [of the appellee], that the disclosures therein correspond materially and substantially with the disclosures of the said Gillons patent in suit."

In 1920, ten years before the filing of the present suit, the case of Shell Company of California v. American Oilfields Company, In Equity, No. B-60,[1] was tried

---

[1] No opinion for publication.

in the United States District Court for the Southern District of California, Northern Division, at Los Angeles, Cal. That suit was for the alleged infringement of United States patent No. 1,070,361, issued to Trumble Refining Company, assignee, on August 12, 1913. In that case, the appellee herein, which owned the Trumble patent, was suing the American Oilfields Company, which was a user of the Gillons apparatus, for the alleged infringement of the Trumble patent. The court found that there was no infringement. The appellant Gillons attended the hearings and was a witness in that suit. Gillons testified in the instant case that, during the trial of the American Oilfields Case, his suspicions that the appellee herein was infringing his patent were aroused, and that after the decision in that case was rendered, his suspicions "matured or culminated and became fixed." On this point he further testified as follows: "Upon the filing of this [Oilfields] suit by the Shell Company I became suspicious. During the trial there was nothing occurred to relieve me of that suspicion. After the decision was rendered, I was convinced that it was the same, in other words, was an infringement."

On June 17, 1921, nine years before this suit was filed, Judge Edward C. Crow, former attorney general of Missouri, and at that time one of the owners of the patent in controversy, sent the following formal notice of infringement to the appellee:

"We call your attention to the fact that the plants operated by you at Coalinga and Martinez, California, infringe United States Letters Patent One Million, Eighty-four Thousand and Eighty (1,084,080) issued on January 13, 1914, and owned by the undersigned and his associates.

"We request that you desist from the use of such plants at once and account to us for the past profits and benefit had by you through the past use of said infringing devices.

"We trust that you will give this matter your immediate attention, otherwise we will be compelled to seek legal relief against you."

On July 22, 1921, Graham and Harris, a firm of attorneys representing the appellee, wrote to Judge Crow, formally denying infringement:

"Referring to your letters of June 17, addressed to our clients, the Shell Company of California and the Roxana Petroleum Corporation, we beg to advise you that we have carefully considered your charge of infringement of the Gillons patent by these companies.

"We have arrived at the conclusion that no plant operated by either of the above named companies infringes the Gillons patent and have so advised our clients."

Judge Crow sent a copy of his letter of June 17, 1921, to Gillons, but Gillons testified that, up to the moment of giving his testimony, it had always been his understanding that the appellee's attorneys had "paid no attention whatever" to Judge Crow's notice. Accordingly, there is no force to the appellant's suggestion that the appellee's denial of infringement contributed toward justifying Gillons "in believing that at that time Shell was not using Gillons' patent." Indeed, it is somewhat naive to suggest that even Judge Crow, who did receive the letter of denial, was in any way misled by it. In view of his definite charge of infringement and threat of suit, it is not reasonable to suppose that an experienced lawyer would have been lulled into security by the bare denial of the alleged infringer. Judge Crow's letter was not one of inquiry; it was a direct statement of infringement and a demand for an accounting.

If, as his letter clearly indicated, Judge Crow *knew* that the appellee was infringing, he should have carried out his threat of seeking "legal relief" when the appellee failed to give "immediate attention" to his request for an accounting.

Judge Crow's threat of "immediate attention or otherwise legal relief" having failed, the Gillons patent interests tried again—this time adopting a less hostile tone. On August 6, 1927, John H. Miller, a San Francisco attorney, sent the following letter to the appellee:

"Mr. B. T. Spalding and The Gillons Process Company have placed in my hands the Gillons patent for treating petroleum oil, with authority to negotiate for sale of the same; or, in default of a sale being made, to prosecute infringers.

"Your Company is the logical one to own this patent, because you already own the Trumble patent. Therefore, I would like to make an appointment with you at your earliest convenience to discuss this matter. I have full authority from Mr. Spalding."

On August 15, 1927, Mr. Miller wrote another letter to the appellee, in an even friendlier vein:

"I am in receipt of a letter from Mr. Spalding which says that he has just received from another an offer to pay $250,000 for the Gillons patent, coupled with a covenant to prosecute infringers and pay over one-half the royalties collected. The companies using the process in infringement of the patent, he says, are California Petroleum, Pan-American, Associated, General Petroleum, Standard Producers and Refiners, Midcontinent and Texas—thirty plants all told. He has also received an offer from a Texas company offering to pay $35,000 for the right to use the process in Texas.

"He feels a moral obligation to allow your Company to have the first chance to secure the patent, and therefore he is holding up the above offer temporarily until you decide whether your Company cares to take over the patent at the sum of $300,000.

"Without desiring to appear unduly persistent, he requests that you advise me at an early date of your attitude with regard to his offer to sell for $300,000, which I recently submitted to you.

"Inasmuch as your Company owns the Trumble patents, your position would be strongly fortified by owning the Gillons.

"I await an early answer."

It will be observed that in the foregoing letter the appellee no longer is named among the alleged infringers of the Gillons patent.

In view of the fact that, in 1920 or 1921, the applicant for the patent in suit had become "convinced" that the appellee was infringing upon his alleged invention, it is somewhat surprising to learn that a person interested in the Gillons patent felt a "moral obligation" to allow the alleged infringer "the first chance to secure the patent"—for $300,000. The appellant Shaw admitted that he contacted Spalding, and saw the above-quoted letters from Mr. Miller to the appellee. The appellant Gillons, however, states that the letters were written without his knowledge, but adds that "there were others, my associates, as I have said, whose business it was to conduct these things."

On August 23, 1927, the appellee addressed to Mr. Miller the following letter:

"Referring to your letter of August 15, 1927:

"We find that we would not be interested in your proposal to acquire the Gillons patent. We are not using the apparatus described therein, nor do we contemplate its use as it would have no advantage for us. Neither do we think that the patent would fortify our Trumble patents.

"However, we appreciate the opportunity offered and thank you for your courtesy."

The findings of the court below as to the appellants' laches in delaying the filing of suit for infringement were as follows:

"(11) The Gillons patent in suit issued January 13, 1914, and expired January 13, 1931. This suit was not commenced until February, 1930, eleven months before the patent expired. * * *

"(12) None of the excuses for the long delay in bringing suit set forth in the Bill of Complaint have been established by the evidence.

"(13) In 1921 the plaintiffs had reasonably complete knowledge of the construction and mode of operation of defendant's Trumble units, and plaintiffs have failed to show any valid excuse for the long delay from 1921 to 1930 in commencing this action."

In his memorandum opinion, the District Judge made the following comment: "On the issue of laches, it is evident that in 1921, at the time of the American Oil Fields case, plaintiffs had reasonably complete knowledge of the mode of operation of defendant's Trumble Units. Furthermore they had long been described in scientific publications."

In their briefs, the appellants seek to avoid the bar of laches on the following three grounds:

1. That in regard to its apparatus and mode of operation, the appellee continually resorted to fraud and deception, while secretly infringing, and that infringement was continually asserted by the appellant without knowledge sufficient to bring suit.

2. That the appellants have never been in a financial position to prosecute this litigation.

3. That the record discloses no evidence of prejudice or any inference of prejudice to the appellee; but that on

the contrary, the delay in filing suit resulted in a great benefit to the appellee.

We will consider these three grounds seriatim.

■ At the outset, it will be helpful that we place our inquiry into its proper setting. It must be borne in mind that the decision of the trial court on the subject of laches will not be set aside unless it is palpably wrong.

In The Kermit, 76 F.(2d) 363, 367, certiorari denied, Lamborn v. American Ship & Commerce Nav. Co., 296 U.S. 581, 582, 56 S.Ct. 93, 80 L.Ed. 411, we said: "As the decisions indicate, the question of laches is addressed to the sound discretion of the trial judge, and his decision will not be disturbed on appeal unless it is so clearly wrong as to amount to an abuse of discretion." See, also, 21 C.J. 217–219.

The appellants' first excuse for their delay in bringing suit is as follows: "Promptly after locating Daams and learning from him for the first time [in 1929], contrary to all published information, that the defendant in its 1915 installation had in fact used the perforated plate or plates at the top of the separator to break-up the oil; this suit was commenced, appellants believing that such partial adoption of Gillons was an infringement. However we have in this case proven *complete* adoption of Gillons' invention."

In their reply brief, the appellants repeat their assertion "that it was upon Daams' story of an early use of perforated plates that suit was brought."

This insistence upon the controlling importance of the use of perforated plates as constituting infringement, runs through the appellants' briefs. Thus, in discussing ten publications issued prior to the trial of the American Oilfields Case, supra, in 1920 and 1921, the appellants declare, with italic emphasis: *"It is of the utmost significance and importance that not one of these ten publications show[s] the use of the two or of any perforated plates, 26 and 27, above the first imperforate cone or plate 28, of Trumble patent 1070361, the subject matter of the American Oilfields Case."*

Other similar statements are to be found in the appellants' briefs.

■ There are four complete answers to the appellants' plea that they did not know about the perforated plates until 1929, and that therefore they did not bring suit prior to that year.

First, in a sworn statement, referred to above, the appellant Gillons asserted that, from a Government bulletin published in 1919, it "clearly" appeared "that the disclosures therein correspond materially and substantially with the disclosures of the said Gillons patent in suit." As the appellants themselves point out, the bulletin in question did not disclose perforated plates. If Gillons believed that an imperforate structure infringed his patent, it is difficult to see why, before filing their suit, the appellants had to wait until they learned of perforations.

Second, it should be borne in mind that, as we have seen, the appellant Gillons testified that he became "convinced" of infringement as early as 1920 or 1921. Again it may be asked: Why did Gillons and his associates wait until 1930 before instituting their suit, when in 1921, at the close of the Oilfields Case, Gillons, the alleged inventor, was positive that his patent was being infringed?

Third, both Gillons and Thomas D. Boyce, one of the appellants' expert witnesses, testified that perforated plates were not essential elements of the Gillons separator. The testimony of Gillons on this point was as follows:

"Q. Then an apparatus as shown on Exhibit 'B' for identification which omitted, say, the baffle plate 33, would not contain the invention that you have shown in that apparatus: Is that your understanding? A. No, it is not. I think any method that permits the carrying of the oil into a separator and permits it to be dropped down, whether over plates or within the tank without plates, or any method of breaking up is wholly within the scope of my invention. I believe that in no place in my specification do I limit myself as to the method of breaking it up—to the scope of them—in any sense. I never intended to do that.

"I believe if you had baffle plates without holes in them in an apparatus such as is shown in Exhibit 'B' for identification, you still would have the construction of my invention. * * *

"Q. That is, if it has any suitable mechanism inside the evaporator to assist in separating the vapors from the hot oil it would contain the invention of your patent: Is that right? A. Yes.

"Q. *And whether those means are in the form of perforated baffle plates or other form would make no difference?* A. *No, so long as they are broken up over some obstruction or other.*" (Italics our own.)

And thus Boyce:

"Q. According to your understanding would an apparatus also have this important hook-up of Mr. Gillons which you have referred to if the plates in the separators were solid instead of perforated? A. I don't think it would make any difference."

Similarly, neither Gillons nor Judge Crow could have been misled by certain publications issued between the years 1915 and 1923, frequently referred to in the briefs. The appellants insist that none of these publications showed the appellee's units as having perforated plates. As we have seen, however, perforated plates were an immaterial part of the Gillons structure.

Finally, it must be remembered that, as far back as 1921, Judge Crow, the appellants' predecessor in interest, sent to the appellee a formal notice of infringement. If Judge Crow, an experienced attorney, did not seriously believe that the appellee was infringing, why did he send the notice? Was he, in the language of the day, "bluffing"?

■ Such a contention cannot be heard in a court of equity. After sending a formal notice, patent owners will not be heard to say that they did not know of the alleged infringement. In Wilkie v. Manhattan Rubber Mfg. Co. (D.C.) 8 F.(2d) 785, 788, affirmed, 14 F.(2d) 811 (C.C.A.3), the court said:

"As to the defense of laches, reference has been made to a letter of April 21, 1909, written to the Manhattan Rubber Manufacturing Company, in which it is notified of the patent and warned not to infringe. On June 15, 1922, the plaintiff in this suit acquired the rights of the Stoughton Rubber Company and brought his suit in May of 1923. Of course, the president of the Stoughton Rubber Company says that he did not know the Manhattan Rubber Company was infringing his patent. The letter, he says, was sent as a matter of precaution. There is the circumstance that it is said that the only way the discovery could be made that the patent was being infringed would be by cutting open the rolls. However, it seems useless to infer that the Stoughton Rubber Company did not know of the alleged infringement. The Manhattan Rubber Company took the letter in the only possible way, as a threat of suit, and purchased one of the early Pontoosuc rolls for the purpose of defense. Fourteen years elapsed between the threat of suit and the actual commencement of the action, and the action was not commenced until after the patent had been acquired by Wilkie.

"The District Court said, in Searchlight Horn Co. v. Victor Talking Machine Co., 261 F. 395, at page 404: '*Long acquiescence*, however, in the infringement of the exclusive right conferred by the patent, *will bar the enforcement of the exclusive rights.' This must necessarily be so, where the assignee steps into the picture after 13 years of unprevented infringement after warning given.*" (Italics our own.)

It will be observed that in the foregoing case there was merely a warning that the defendant should not infringe. In the present instance, however, we have a definite accusation, a definite demand for an accounting, and a definite threat of suit. A fortiori, therefore, the appellants herein cannot be heard to say that they did not know of the alleged infringement.

■ Any laches of which Judge Crow may have been guilty, of course, can be imputed to the present appellants. In 21 C.J. 216, this fundamental rule is thus stated: "Generally speaking plaintiff is barred from relief by the laches of one with whom he stands in privity, as a grantee by the laches of his grantor, an assignee by that of his assignor," etc.

To summarize our views on this phase of the case, we find that the record shows that two of the appellants' chief witnesses—one of them the author of the alleged invention—testified that perforated plates were not an essential element of the Gillons separator. From this it follows that the appellants could not have been prejudiced by the appellee's alleged concealment of its structures at Martinez; for the testimony just referred to shows that the information which, according to the appellants, prompted them to file suit after a delay of at least nine years, related to an inconsequential detail of construction. Furthermore, by Gillons' own testimony, he became "convinced," in 1921,

that the appellee was infringing; yet suit was filed only in 1930. The appellants have not satisfactorily explained this nine years' delay.

In this connection, we cannot refrain from adverting to the following statement contained in the appellants' reply brief: "We have never found any decision or opinion by any court holding that a plaintiff without knowledge or proof but possessed merely of a *hope* or suspicion that he has a cause of action must file his cause or be guilty of laches merely because he may acquire the right of discovery after filing suit." (Italics our own.)

Applying, as we must, the foregoing observation to the instant case, we find the somewhat surprising suggestion that patent holders might "hope" that their patent was being infringed!

Be that as it may, in view of the facts that we have outlined above, we hold that there is no merit to the appellants' excuse that their delay in bringing suit was caused by the fact that not until 1929 did they learn of the appellee's use of perforated plates.

Accordingly, we further hold that there is ample support in the record for the lower court's finding that "In 1921 the plaintiffs had reasonably complete knowledge of the construction and mode of operation of defendant's Trumble units."

■ We turn next to the excuse that the appellants have never been in a financial position to prosecute the instant suit. The argument, of course, is that, under those circumstances, their mere delay cannot be construed as acquiescence in the alleged infringement. It is the plea of Romeo's Apothecary: "My poverty, but not my will, consents."

So far as the appellants are concerned, there are two conclusive answers to this counterdefense.

In the first place, the excuse of poverty can, at best, be urged only as to the appellants Gillons and Shaw. There is no suggestion that the appellant Richfield Oil Company or the former patent owners, Judge Crow and Joseph B. Shannon, a state senator of Missouri, lacked the funds necessary to bring suit.

Second, by the weight of authority, poverty is no excuse for delay in filing suit.

In Leggett v. Standard Oil Company, 149 U.S. 287, 294, 13 S.Ct. 902, 905, 37 L.Ed. 737, the court said: "No sufficient reason is given for this delay in suing. It is sought to be excused on the ground of the plaintiff's poverty during this period; but in the case of Hayward v. National Bank, 96 U.S. 611, 618 [24 L.Ed. 855], this court said that a party's poverty or pecuniary embarrassment was not a sufficient excuse for postponing the assertion of his rights."

In Cummings v. Wilson & Willard Mfg. Co., 4 F.(2d) 453, 454, 455, certiorari denied, 268 U.S. 701, 45 S.Ct. 637, 69 L.Ed. 1165, this court followed the doctrine laid down in the Leggett Case, supra. See, also, Wolf Mineral Process Corporation v. Minerals Separation North American Corporation (C.C.A.4) 18 F.(2d) 483, 490, certiorari denied, 275 U.S. 558, 48 S.Ct. 118, 72 L.Ed. 425.

■ The third and last ground upon which the appellants seek to avoid the bar of laches is that the record discloses "no evidence of prejudice nor any inference of prejudice to the appellee." "On the contrary," the appellants assert, "there was a very great benefit to appellee."

In support of this latter claim of actual benefit to the appellee as a result of the delay, the appellants point to the "statutory limitation of six years within which period only may the infringer be required to account for his profits and the damages suffered by a plaintiff." The provision to which the appellants refer is 35 U.S.C.A. § 70, the applicable clause of which reads as follows: "But in any suit or action brought for the infringement of any patent there shall be no recovery of profits or damages for any infringement committed more than six years before the filing of the bill of complaint or the issuing of the writ in such suit or action." The appellants further point out that, since the present suit was commenced February 27, 1930, under the foregoing statutory provision the appellee could be compelled to account for the profits at most only for the period extending from February 27, 1924, to January 13, 1931, the expiration date of the patent. From this fact the appellants argue as follows: "If infringement existed in 1921 there is a period of three years during which the defendant's appropriation of the Gillons patent leaves defendant with no liability therefor. The huge quantities of oil run through the Trumble units at Martinez, to say nothing of defendant's other plants

employing the same apparatus and mode of operation, amount to many million barrels of oil in this three-year period (see Testimony of Pyzel, Tr. 1095–96). At the royalty of 2 cents per barrel suggested by appellee, there has been an advantage to defendant, a direct saving of not less than $1,000,000.00 at Martinez alone by such delay."

The record reference given by the appellants, however, does not support their contention. Daniel Pyzel, a director of the appellee, who stated that his recommendation must be had before any offer of settlement can be made by the appellee for any charge of infringement against it, testified that the royalty of two cents per barrel was suggested, not by the appellee, but by George J. Henry, a retired consulting engineer specializing exclusively in patents, who was called by the appellants as an expert witness. Pyzel, at the page of the transcript cited by the appellants, testified that he told Henry that he considered a royalty of 2 cents per barrel "rather high," but would "assume" that figure for their calculation of the supposed infringement.

Quite aside from all this, however, the appellants have failed to show that the appellee was not injured by their delay. The Miller correspondence, to which we have already referred, was calculated to lull the appellee into a feeling of security that the threat of suit, contained in Judge Crow's letter of 1921, was not to be carried out. It will be recalled that in his letter of August 15, 1927, Mr. Miller announced that Spalding, who, according to the appellant Shaw, "was purchasing Mr. Gillons' interest, held under option," felt "a moral obligation to allow [the appellee] to have the first chance to secure the patent," so as to "fortify" the appellee's position as the owner of the Trumble patents.

The entire Miller correspondence shows that, as far back as 1927 at least, the appellee might well have believed that the Gillons patent holders had dropped their charges of infringement. In Closz & Howard Mfg. Co. v. J. I. Case Threshing Mach. Co. (D.C.) 216 F. 937, 941, the court said: "The plaintiff having remained quiet for six years with knowledge of defendant's infringement, it was not unreasonable for the defendant to believe that, notwithstanding the notice of suit and its commencement, the plaintiff did not really intend to press its claim."

As a matter of fact, during the nine years from the time when Gillons became "convinced" that the appellee was infringing, to the time when suit was filed, the appellants, despite their notices of infringement, delayed the institution of court proceedings against the appellee. During that time the appellee became, "largely because" of the alleged infringement, according to the appellants, the biggest oil company in the world. As we have seen, the appellants have failed to explain satisfactorily why they thus stood by and allowed the appellee to build up a large business before they filed their suit.

Moreover, we think that the appellants have confused the defense of estoppel with that of laches, so far as the facts of the instant case are concerned. For example, they contend that: "Only in causes where the conduct of a plaintiff amounts to an equitable estoppel should [the defense of laches] be held to lie."

█ It is well settled, however, that the two defenses are governed by different rules. In 21 C.J. 211, note 38, we find the principle thus stated: "(6) While in many instances the facts that are held to constitute laches are such as would create an estoppel, more frequently they are not. * * * (7) The rules governing estoppel are more clearly defined and are less flexibly applied than those governing laches. * * * (8) The defense of laches is directed more intimately to the conscience of the chancellor, and whether it shall prevail rests in his discretion."

█ In determining what delay constitutes laches, courts of equity are not bound by the statutes of limitations relating to actions at law of like character; but such courts "usually act or refuse to act in analogy to" such statutes of limitations.

In the leading case of Kelley v. Boettcher (C.C.A.8) 85 F. 55, 62, Judge Sanborn expounded the rule in the following language: "The meaning of this rule is that, under ordinary circumstances, a suit in equity will not be stayed for laches before, and will be stayed after the time fixed by the analogous statute of limitations at law; but if unusual conditions or extraordinary circumstances make

it inequitable to allow the prosecution of a suit after a briefer, or to forbid its maintenance after a longer, period than that fixed by the statute, the chancellor will not be bound by the statute, but will determine the extraordinary case in accordance with the equities which condition it."

See, also, Ide v. Trorlicht, Duncker & Renard Carpet Co. (C.C.A.8) 115 F. 137, 148; Brun v. Mann (C.C.A.8) 151 F. 145, 154, 12 L.R.A.(N.S.) 154; Wilson v. Plutus Mining Co. (C.C.A.8) 174 F. 317, 320–321; Layton Pure Food Co. v. Church & Dwight Co. (C.C.A.8) 182 F. 35, 40, 32 L.R.A.(N.S.) 274; Armstrong Cork Co. v. Merchants' Refrigeration Co. (C.C.A.8) 184 F. 199, 206, 207; Vapor Car Heating Co. v. Gold Car Heat. & L. Co. (D.C.) 296 F. 188, 200, affirmed, 16 F.(2d) 194 (C.C.A.2).

When the suit is filed after the statutory period, injury is presumed. In McGrath v. Panama R. Co. (C.C.A.5) 298 F. 303, 304, the court said: "The appellant suggests that no injury is shown to have been done to the appellee by the delay in filing the libel. Injury is presumed from the statutory period of limitation in common-law actions, and, when equity adopts the statutory period, it adopts along with it the presumption of injury, until the contrary is shown." See, also, Westfall Larson & Co. v. Allman-Hubble Tug Boat Co. (C.C.A.9) 73 F.(2d) 200, 203.

In the patent cases, the "analogous" statutory period is six years. Yates v. Smith (D.C.) 271 F. 27, 31, affirmed, 271 F. 33 (C.C.A.3), certiorari denied, 256 U. S. 693, 41 S.Ct. 534, 65 L.Ed. 1174; United Drug Co. v. Ireland Candy Co. (C.C.A.8) 51 F.(2d) 226, 232, certiorari denied, 284 U.S. 683, 52 S.Ct. 200, 76 L. Ed. 577; 35 U.S.C.A. § 70.

In their brief, the appellants say: "Although long continued withholding suit may be fatal on a motion for injunction, it will not prevent the Court from granting such relief as may be just and equitable on final hearing. * * * We seek no injunction here. What we seek is an accounting, and that only."

The appellants have confused the rule as to preliminary injunctions with that governing permanent injunctions. When the "relief" sought "on final hearing" is *an accounting for alleged infringement,* the law is precisely the opposite of that contended for by the appellants.

In the leading case of McLean v. Fleming, 96 U.S. 245, 253, 257, 24 L.Ed. 828, the court said: "Equity courts will not, in general, refuse an injunction on account of delay in seeking relief, where the proof of infringement is clear, even though the delay may be such as to preclude the party from any right to an account for past profits."

Again, in Menendez v. Holt, 128 U. S. 514, 524, 525, 9 S.Ct. 143, 145, 32 L. Ed. 526, Mr. Chief Justice Fuller used the following language: "Delay in bringing suit there was, and such delay as to preclude recovery of damages for prior infringement; but there was neither conduct nor negligence which could be held to destroy the right to prevention of further injury."

See, also, New York Grape Sugar Co. v. Buffalo Grape Sugar Co. (C.C.) 18 F. 638, 646; Closz & Howard Mfg. Co. v. J. I. Case Threshing Mach. Co., supra (D.C.) 216 F. 937, at page 941; Simpson v. Newport News Shipbuilding & Dry Dock Co. (D.C.) 18 F.(2d) 318, 321, 322, affirmed, 18 F.(2d) 325 (C.C.A.2).

In the instant case, there is an additional and special reason for invoking the bar of laches. One of the important questions in the present controversy is the date on which Gillons reduced his alleged invention to practice, as bearing upon the validity of his patent. The appellants contend that Gillons should be allowed the date of November, 1909, as his reduction to practice. The court below found that Gillons' earliest reduction to practice was on July 22, 1911, at Richfield, Cal.; and this finding is assigned as error.

While testifying regarding the work at Richfield, Gillons referred to "some notes of dates." Regarding those memoranda, the following colloquy occurred:

"Mr. Fryer. If your Honor please, may I see the memorandum the witness is referring to?

"Mr. Blakeslee. Certainly, certainly.

"The Witness. I will be glad to show it to you, Mr. Pryor.

"Mr. Blakeslee. Q. What is your best recollection now, Mr. Gillons?

"Mr. Fryer. Just a moment, please, Mr. Blakeslee, while I look at this. If your Honor please, this is a memorandum

prepared apparently just recently and not a memorandum made at the time. We object to its use on that ground.

"The Court. I will have to sustain the objection. Exception. The memorandum must be made at the time to be used for the purpose of refreshing recollection.

"Mr. Blakeslee. I understand that general rule, your Honor. The witness has some trouble remembering dates. He has made this in order that he may give his best recollection."

■ It is precisely because equity recognizes this frailty of human memory that she has launched her canon against unreasonable delay in bringing suit. Gillons is not to be penalized for his faulty recollection. He is, however, responsible for having stood idly by for so long a period that he can no longer recapture the misty memories of another day—memories that have, perhaps, vanished as completely as the snows of yesteryear.

In 21 C.J. 234–236, the rule is thus stated: "A court of equity will refuse relief after inexcusable delay because of the difficulty, if not the impossibility, of arriving at a safe and certain conclusion as to· the truth of the matters in controversy and doing justice between the parties, where the evidence has been lost or become obscured through the loss of documents, or through death or disappearance of one or more of the participants in the transaction in suit or of the witnesses thereto, *or through impairment of the memory of participants or witnesses still living. While the rule requires for its support no element of estoppel, but is founded on public policy,* the fact that the delay has tended to defeat defendant's power to prove his right is an additional reason for its application." (Italics our own.)

■ The principle is particularly applicable to the instant case, where, in 1934, Gillons, the alleged inventor and therefore the chief witness on the subject of reduction to practice, was attempting to testify in detail as to matters that had occurred a quarter of a century before. Even for a witness possessing a good memory, such testimony would have constituted a mnemonic feat; particularly difficult was it for Gillons, who, according to his own counsel, had "some trouble remembering dates."

To sustain the lower court's findings of laches in the instant case, however, it is not necessary to rely upon the foregoing special considerations, or upon estoppel, or even upon the "analogous" statute of limitations. There is another and all-embracing principle that amply justifies the District Judge's exercise of discretion.

■ Equity frowns upon stale demands. She will not aid one who has slept upon his rights. She turns her back upon a litigant who has been guilty of unreasonable delay in filing suit.

In a line of decisions extending farther back than a century, our Supreme Court has recognized this equitable doctrine, as being grounded upon considerations of "the peace of society" and of "public convenience." In Piatt v. Vattier, 9 Pet. 405, 416, 417, 9 L.Ed. 173, Mr. Justice Story said: "The established ·doctrine, or, as Lord Redesdale phrased it, in Hovenden v. Annesley, 2 Sch. & Lef. 637–8, 'the law of courts of equity,' from its being a rule adopted by those courts, independent of any positive legislative limitations, is, that it will not entertain stale demands. Lord Camden, in Smith v. Clay, 3 Bro. C.C. 640 note, stated it in a very pointed manner. 'A court of equity,' said he, 'which is never active in relief against conscience or public convenience, has always refused its aid to stale demands, where the party has slept upon his rights, or acquiesced for a great length of time. Nothing can call forth this court into activity, but conscience, good faith and reasonable diligence. Where these are wanting, the court is passive and does nothing; *laches* and neglect are always discountenanced; and therefore, from the beginning of this jurisdiction, there was always a limitation of suits in this court.' "

Again, in Wagner v. Baird, 7 How. 234, 258, 12 L.Ed. 681, the court said:

"But there is a defence peculiar to courts of equity, founded on lapse of time and the staleness of the claim, where no statute of limitations directly governs the case. In such cases courts of equity often act upon their own inherent doctrine of discouraging, for the peace of society, antiquated demands, by refusing to interfere where there has been gross laches in prosecuting rights, or long acquiescence in the assertion of adverse rights. (2 Story, Eq. § 1520.)

"A court of equity will not give relief against conscience or public convenience where a party has slept upon his rights."

See, also, McLean v. Fleming, supra, 96 U.S. 245, at page 258, 24 L.Ed. 828; Hayward v. National Bank, 96 U.S. 611, 617, 618, 24 L.Ed. 855; Speidel v. Henrici, 120 U.S. 377, 387, 7 S.Ct. 610, 30 L.Ed. 718; Leggett v. Standard Oil Company, supra, 149 U.S. 287, at page 294, 13 S. Ct. 902, 37 L.Ed. 737; Lane & Bodley Co. v. Locke, 150 U.S. 193, 201, 14 S.Ct. 78, 37 L.Ed. 1049; Thorn Wire Hedge Co. v. Washburn & Moen Co., 159 U.S. 423, 444, 16 S.Ct. 94, 40 L.Ed. 205; Gildersleeve v. New Mexico Mining Co., 161 U.S. 573, 577–579, 16 S.Ct. 663, 40 L. Ed. 812; Patterson v. Hewitt, 195 U.S. 309, 317–319, 25 S.Ct. 35, 49 L.Ed. 214; La Republique Francaise v. Schultz (C. C.) 94 F. 500, 501, affirmed 102 F. 153 (C.C.A.2); Covert v. Travers Bros. Co. (C.C.) 96 F. 568, 569; Hall v. Frank (D.C.) 195 F. 946, 952 (nine years' delay after knowledge of alleged infringement), affirmed, 202 F. 213 (C.C.A.2); Westco-Chippewa Pump Co. v. Delaware Electric & S. Co. (C.C.A.3) 64 F.(2d) 185, 197.

In connection with the bar of laches, from the earliest days federal courts have emphasized the distinction between a reasonable and an unreasonable delay in bringing suit—even *within* the period designated by the statute of limitations.

In Patterson v. Hewitt, supra, 195 U. S. 309, at page 318, 25 S.Ct. 35, 37, 49 L.Ed. 214, Mr. Justice Brown used the following language: "But where the statute is in terms applicable to suits in equity, as well as at law, it is ordinarily construed, in cases demanding equitable relief, as fixing a time beyond which the suit will not, under any circumstances, lie; but not as precluding the defense of laches, provided there has been unreasonable delay within the time limited by the statute. In an action at law, courts are bound by the liberalism of the statute; but in equity the question of unreasonable delay within the statutory limitation is still open. [Cases cited.]"

In Prince's Metallic Paint Co. v. Prince Manuf'g Co. (C.C.A.3) 57 F. 938, 944, the court said: "In courts of equity the rule is to withhold relief where there has been unreasonable delay in prosecuting a claim, or long acquiescence in the assertion of adverse rights. [Cases cited.] Again and again has it been judicially declared that nothing can call into activity a court of equity but 'conscience, good faith, and reasonable diligence.' [Cases cited.] In McLaughlin v. Railway Co. [C.C.] 21 F. 574, Judge Brewer held a bill for the infringement of a patent, alleging the unauthorized use and construction of a patented invention for 13 years, without stating an excuse for the plaintiff's delay in suing, to be demurrable. Laches for even less than the statutory period of limitations, aided by other circumstances, will bar a right. [Case cited.]"

In Miles v. Vivian (C.C.A.2) 79 F. 848, 853, the court said: "Independently of any statute of limitations, courts of equity uniformly decline to assist a person who has slept upon his rights unreasonably long, and shows no excuse for having done so."

And in more recent days, in the case of Window Glass Mach. Co. v. Pittsburgh Plate Glass Co. (C.C.A.3) 284 F. 645, 650, certiorari denied, 261 U.S. 623, 43 S.Ct. 518, 67 L.Ed. 832, the following language was used:

"The circumstances were such, without repeating them at length, that the plaintiffs knew or were chargeable with knowledge of the practices and the apparatus employed by the defendant at its several works during these periods. [Cases cited.] On these facts and circumstances the defendant makes the defense of laches.

"This defense is based on a well-settled principle of law. In its application courts recognize the general rule that, in a case of this kind, mere delay, unaccompanied by anything else, will not ordinarily bar a suit *for injunction* against a naked infringer. [Cases cited.] But they also recognize a distinction between mere delay and unreasonable delay, where in the latter is involved the element of lack of diligence and the consequent inequity, under the circumstances, of permitting the claim to be enforced." (Italics our own.)

See, also, La Republique Francaise v. Schultz (C.C.A.2) supra, 102 F. 153, at page 156; Cummings v. Wilson & Willard Mfg. Co., supra (C.C.A.) 4 F.(2d) 453, at page 455; Wolf Mineral Process Corp. v. Minerals Separation N. A. Corp., supra (C.C.A.) 18 F.(2d) 483, at page 490 (about ten years' delay).

Applying the foregoing well-established doctrines of equity to the facts disclosed by the present record, we cannot say that, in its findings of laches, the court below abused its discretion.

Accordingly, the decree is affirmed.